THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT C. NICHOLSON, Defendant-Appellant.

First District (3rd Division)   No. 1—87—1535

Opinion filed August 7, 1991.

Randolph N. Stone, Public Defender, of Chicago (Denise R. Avant and Ronald Alwin, Assistant Public Defenders, of counsel), for appellant.

John M. O'Malley, State's Attorney, of Chicago (Inge Fryklund and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a jury trial, defendant Robert Nicholson was convicted of possession of a stolen motor vehicle and criminal trespass to vehicle. Defendant was subsequently sentenced to serve a term of six years' imprisonment. On appeal defendant argues that (1) the trial court erred in ruling that he failed to establish a *prima facie* case of racial discrimination in the State's exercise of its peremptory challenges; (2) the trial court erred when it refused to dismiss for cause jurors who were biased, thus forcing him to exercise his peremptory challenges to eliminate the jurors and to accept an unwanted juror; and (3) the possession of stolen motor vehicle statute violates the due process and proportionate penalties clauses of the Illinois Constitution. We remand for a *Batson* hearing.

During the jury selection process, the State exercised six peremptory challenges. Five of those challenges were used to exclude African-American venirepersons. One challenge was used to exclude a venireperson who had a Hispanic surname. After the State had exercised peremptory challenges to dismiss two African-American venirepersons, defendant, a black man, raised a *Batson* objection. In chambers, both the State and the court noted that the accepted panel of four jurors had a black female member. Although the judge did not require the State to explain its peremptory challenges, the assistant State's Attorney stated that he dismissed one black juror because he was the same age as defendant and had no roots in the community. Defense counsel pointed out that a white male juror who was also in the same age group had been accepted by the State. The State further explained that the juror did not properly respond to the judge's questions. Defense counsel argued that the potential juror responded

that he was married with three children and on general assistance. The trial court denied the defendant's motion stating, "I don't see any systematic exclusion."

After the State had exercised its fifth peremptory challenge, defendant raised another *Batson* objection. Defense counsel argued that the State had exercised all five of its peremptory challenges to strike blacks from the jury. Defense counsel noted that the State had dismissed an additional two black females and a black male. The court noted that there was no systematic exclusion because, at that point, there were two black jurors on the panel. The State responded that one of the excluded veniremen had a prior misdemeanor criminal conviction and cleaned his fingernails during the *voir dire*. The court reprimanded the State for failure to disclose information regarding a potential juror's criminal history to the court and defense counsel, but denied defendant's motion for a *Batson* hearing.

At trial, the following evidence was adduced. On August 29, 1986, at approximately 9 p.m., Annette Wilson parked her red 1985 Chevrolet Camero "Z28," license plate number NETO 1, near El Torito's restaurant in Lombard. When she exited the car, Ms. Wilson locked the door and took her car key with her. At approximately 12:15 a.m., when she returned to the location where she had parked her car, it was not there. According to Ms. Wilson, she never gave anyone permission to enter into or drive her car. She reported the theft of her automobile to the Lombard police department.

At approximately 5:55 p.m. on August 30, 1986, Chicago police officer Sam Ruffino was on patrol duty in the vicinity of Kostner and Courtland Streets in Chicago when he observed a red Z28 automobile with license plate number NETO 1 run a stop sign. Officer Ruffino pulled the car over, and both he and the driver, whom he later identified as defendant, exited their respective autos. Ruffino told the driver why he was stopped and requested a driver's license. When the driver indicated that he did not have a license, Ruffino instructed him to follow him to the police station to post a cash bond.

When they arrived at the station, the police department computer was "down" so Ruffino was unable to run a license plate check on defendant's vehicle. Defendant identified himself as Ben Joseph, and Ruffino issued two traffic citations in that name and released defendant on his own recognizance. On September 2, 1986, in an unrelated incident, Steven Pryor found two Chicago traffic tickets and a bond receipt issued to Ben Joseph inside his automobile. Pryor took the items to the Itasca police department. Itasca Detective Peter Anderson performed a computer check of the license plate number on the

tickets which revealed that the automobile had been reported stolen. Anderson contacted Ruffino and arranged for him to view a photographic array. Ruffino identified defendant as the driver that he issued traffic citations to on August 30, 1986.

On September 5, 1986, Schaumburg police officer Fess Cloonan observed a red Chevrolet Camero with license plate number NETO 1 parked in an awkward manner next to the Woodfield Mall Theater. After the car remained unmoved for two hours, Cloonan ran a computer check of the license plate number which revealed that the automobile was stolen. Cloonan's inspection of the automobile revealed that the steering column was cracked and the car radio was missing.

On September 9, 1986, Schaumburg Detective Anderson and a fellow officer went to the Glendale Heights address listed on the traffic citations issued in the name of Ben Joseph. When they arrived, defendant was in the parking lot of the apartment complex. Anderson asked defendant if he knew the whereabouts of Ben Joseph, and defendant took him to an apartment in the building. The officers were admitted into the apartment by Ben Joseph who told them that he was in Detroit on the day that the tickets were issued and that he did not know anything about the incident.

On January 11, 1987, defendant was arrested by Chicago police officers. During a post-arrest interview, the officers told defendant that the victim's car had been stolen and asked him about the tickets that were issued while he was driving the car. According to Officer Baumhardt, defendant replied, "Oh yes, I remember that car." Baumhardt testified that defendant admitted he had taken the car but stated that it belonged to his girl friend and he was unable to return it. Defendant's statement was not reduced to writing. After the jury found defendant guilty of possession of a stolen motor vehicle and criminal trespass to vehicle, the trial court sentenced him to serve six years in the Illinois Department of Corrections. This appeal followed.

Defendant first argues that the trial court erred in ruling that he had failed to establish a *prima facie* case of racial discrimination in the State's use of its peremptory challenges. We agree.

The equal protection clause prohibits a prosecutor from using the State's peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90, 90 L. Ed. 2d 69, 83, 106 S. Ct. 1712, 1719.) A criminal defendant may object to race-based exclusions of jurors through peremptory challenges whether or not the defendant and the excluded jurors share the same race. *Powers v.*

*Ohio* (1991), 499 U.S. 400, ____, 113 L. Ed. 2d 411, 419, 111 S. Ct. 1364, 1366.

■ In order to establish a *prima facie* case of racial discrimination in jury selection, defendant is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits those who are of a mind to discriminate to discriminate. (*Batson,* 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724.) Defendant must show that this fact and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude veniremen from the petit jury on account of their race. (*Batson,* 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724.) The relevant circumstances the trial court may consider when determining whether there was discrimination include: a pattern of strikes against black jurors; the prosecutor's questions and statements during *voir dire* examination and in exercising challenges; the disproportionate use of peremptory challenges against blacks; the level of black representation in the venire as compared to the jury; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic; and the race of the defendant, victim and witnesses. *People v. Evans* (1988), 125 Ill. 2d 50, 63-64, 530 N.E.2d 1360, 1365.

The presence of this combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination. (*Batson,* 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724.) In deciding whether defendant has made the requisite showing, the trial court should consider all relevant circumstances. (*Batson,* 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724.) In considering these circumstances, the trial court must be mindful that the exclusion of just one minority venireperson for racial reasons is unconstitutional and provides grounds for reversal. *People v. Harris* (1989), 129 Ill. 2d 123, 175, 544 N.E.2d 357, 380.

■ Once the defendant makes a *prima facie* showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. The prosecutor may not rebut the case merely by denying that he had a discriminatory motive or affirming his good faith in making individual selections. (*Batson,* 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724.) If these general assertions were accepted as rebutting a defendant's *prima facie* case, compliance with the dictates of the equal protection clause would be a vain and illusory requirement. The prosecutor must, therefore, articulate a neutral explanation related to the particular case to be tried. The

court will then have the duty to determine if the defendant has established purposeful discrimination.

The standard of review to be applied in determining whether the trial judge erred in ruling that defendant has failed to establish a *prima facie* case of purposeful prosecutorial discrimination against black venirepersons is whether the ruling is against the manifest weight of the evidence. *People v. Henderson* (1990), 142 Ill. 2d 258, 287, 568 N.E.2d 1234, 1248.

In the present case, the court conducted the *voir dire* in the following manner. The judge questioned the venirepersons generally, asking whether they knew any of the lawyers or the defendant in the present case or if they were familiar with the facts of the case. After eliminating from the venire everyone who was currently involved in a lawsuit, or had been convicted of a crime, the court proceeded to call venirepersons in groups of four. After the four venirepersons were seated in the jury box, the court questioned them individually. The court asked each person the same basic questions using the juror identification cards and some of the questions proposed by the defense. The court generally asked the venirepersons where they worked, their marital status, and their children's ages and occupations, if relevant. The judge also asked if they had any friends or relatives who were lawyers, judges or doctors and if they or their family or friends had ever been the victim of a crime. The judge discussed the burden of proof in a criminal case, and asked each juror if he or she could give both sides a fair trial. If the jurors indicated that they knew lawyers, judges, or doctors, or that they or their family or friends had been a crime victim, the court would inquire further to elicit additional detail.

After the court had questioned four potential jurors, it tendered the panel to the State for acceptance. If the State exercised one or more challenges, the court would have additional venirepersons called and proceed to question each person. After the questioning was complete, the court would again tender the panel of four potential jurors to the State for acceptance. Once the State accepted a complete panel of four jurors, the court would tender the panel to the defense for acceptance. When the defense finally accepted four jurors using the same method, the court would swear in the panel of four, dismiss them and call in a new panel of four potential jurors. The attorneys' statements in the presence of the venire were limited to their excusal of a juror, acceptance of a panel or request for a sidebar.

During the jury selection process the State exercised its peremptory challenges to dismiss the following African-American jurors:

(1) Lavenia McCardy, a female, married with three children ages 32, 29 and 28. Ms. McCardy was employed as a social technician and her husband worked as a forklift operator. Her three children were employed as a post office employee, a secretary and a welder. Ms. McCardy did not know anyone who was a lawyer, doctor or policeman. Neither she nor any of her close family members or friends had been the victim of a crime.

(2) Otis Conner, a male, married with three children. Mr. Conner was unemployed and a general assistance recipient. He had no close family members or friends who were lawyers, doctors or judges. Neither he nor any of his close friends or family members had been victims of crime. He stated that he could give both sides a fair and impartial trial.

(3) Diana Buckner, a female, single, employed as a teacher of retarded children. Ms. Buckner had never served on a jury, and none of her close friends or family members had been victims of crime. She knew someone who was a real estate attorney.

(4) Earl Young, a male, was employed as a school teacher. He was a widower and had never served on a jury before. Two of his automobiles had been broken into, but he felt that he could give both sides a fair trial.

(5) Mary Alice McKinney, a female, Continental Baking employee and mother of one. She did not know any lawyers, doctors or judges and neither she nor any of her family members or friends had been the victim of a crime. She was previously called for civil jury service, but excused. She stated that she could give both sides a fair trial.

The jury was composed of the following people:

Panel One

(1) Robert Brixner, a white male, employed as a teacher and married to a teacher. He and his wife did not have children. Mr. Brixner did not know any lawyers, doctors or judges and neither he nor his family or friends had been the victim of a crime.

(2) Aldine Davis, a black female, post office employee, married to a post office employee. Ms. Davis was the mother of two adult children, one employed as a computer engineer and the other a City of Chicago employee. She had never served on a jury and neither she nor her family had ever been the victim of a crime.

(3) William Caldaliario, a white male, employed as an electric assembler, married to a bank financial counselor. Parent to three school-age children. Prior jury service in a criminal case. He indicated that he was satisfied with the trial process and that he could give both

sides a fair trial. Mr. Caldaliario's father was robbed at gunpoint during the 1970's.

(4) Thomas Cheatam, a white male, employed as a set-up operator for Dual-Fast. Mr. Cheatam was married, with two kids. His wife is employed with Northrup. Mr. Cheatam had one child in school and the other worked for Little Caesars. Called for jury service on a prior occasion, but excused. No lawyers, judges or doctors as friends or family. No family or friends had been a victim of a crime.

## Panel Two

(5) Ernesto Delos Reyes, a white male, employed in a hospital chemistry lab. His wife is employed as a hospital dietician. Mr. Reyes is a parent and was called for jury service on a previous occasion, but excused. He did not know any lawyers or judges. Mr. Reyes had never been the victim of a crime. His father was shot 15 years ago in the Philippines. The offender was never apprehended. He stated he could give both sides a fair trial.

(6) Dale Daniels, a white male, accountant for Continental Materials. His wife is a homemaker with two children. No lawyers, doctors or judges as family or friends. Neither family nor friends had ever been the victim of a crime.

(7) Lenor Miller, a white female, retired, widow. Her husband died of heart failure. They did not have any children. Neither she nor family or friends had ever been the victim of a crime. She stated that she could give both sides a fair trial.

(8) Allan Berglund, a white male, employed as a process engineer. Married with one infant child, his wife is a homemaker. No prior jury service, no friends or family who are judges, lawyers or doctors. Never been a victim of crime and willing to give both sides a fair trial.

## Panel Three

(9) Grace Tillman, female, race unknown, single, public aid caseworker. Called for jury duty on prior occasion, but excused. Both a family member and a friend are Chicago police department detectives. She stated that she would not give more weight to a policeman's testimony. Ms. Tillman had her car stolen some time ago; no one was apprehended. Her sister's apartment was burglarized recently. She stated that she could give both sides a fair trial.

(10) Adlorga Cabarubio, white male, engineering technician. Married to an accountant, parent of two school-age children. No prior jury

service, no friends or family who are lawyers, judges or doctors. He stated that he could give both sides a fair trial.

(11) Jackson Link, male, race unknown, employed in a hospital supply department. His wife and son are both employed at the same hospital. His wife works as a nurse; his son works in the engineering department. Mr. Link's daughter is a typist. He has served on a grand jury and was called for criminal petit jury service, but not selected. Neither he nor his family had ever been the victim of a crime. He stated that he would give both sides a fair trial.

At this point in the jury selection process, defense counsel requested a sidebar. Thereafter, the parties agreed in chambers that two African-American venirepersons had been accepted by the State. The first black juror was Aldine Davis. The identity of the second black juror is not clear from the record although it is apparent from the in-chambers conversation of the judge, State's Attorney and defense counsel that the second black juror was a member of the third panel and, therefore, by a process of elimination, either Grace Tillman or Jackson Link.

(12) Bessie Chambers, female, race unknown. Illinois Bell employee, single, prior civil jury service, case was settled prior to trial. She knows a lawyer who recently passed the bar examination and is working in Springfield. Her brother was killed when she was a child. She stated that she would give both sides a fair trial.

### Alternates

(13) Donna Lindsey, female, race unknown, mental health technician, married to a truck driver. Mother of four, two of her children are in college. She never served on a jury and none of her close friends or family members are lawyers, doctors or judges. In addition, neither she nor any of her family and friends had ever been a crime victim.

(14) Lloyd Bingham, male, race unknown, single, custodial worker for the Chicago Board of Education. A close friend was a police officer, but he would not give more weight to a police officer's testimony. Neither he nor his family or friends had ever been the victim of a crime. He would give both sides a fair trial.

The first issue on appeal is whether the trial court abused its discretion in finding that the defendant failed to establish a *prima facie* case of racial discrimination in the State's use of its peremptory challenges. We will review the trial court's decision by examining the weight of the evidence on each of the relevant circumstances which

may be used to establish a *prima facie* case of racial discrimination in the use of peremptory challenges.

■ Under *Batson*, one of the relevant circumstances which the trial court may consider is a pattern of strikes against black potential jurors. In the present case, the State exercised six peremptory challenges. Five of those challenges were used to exclude blacks from the jury. We find that the State's use of five of six peremptory challenges to exclude African-Americans from the venire constitutes a pattern of strikes against blacks. See *People v. Lockhart* (1990), 201 Ill. App. 3d 700, 710, 558 N.E.2d 1345, 1351.

Two other factors which the trial court may consider are the disproportionate use of peremptory challenges against blacks and the level of black representation in the venire as compared to the jury. A review of the record and briefs in this case does not reveal the total number of blacks in the venire. However, the record does reveal that, exclusive of the jurors who were excused for cause by the court, 27 potential jurors were considered by the State and defendant. Of these 27 venirepersons, 13 were excused through the use of peremptory challenges. Defendant exercised seven peremptory challenges. The record does not reveal whether any of those seven challenges were used to excuse black venirepersons. However, the in-chambers conversations of the parties following defendant's two *Batson* objections, and especially the discussion held after the second objection, indicate that defendant did not exclude any black jurors.

Based on this circumstantial evidence, we conclude that 7 of the 27 potential jurors considered by the State and defendant were black. Of these seven potential black jurors, five were peremptorily challenged by the State. The remaining two black venirepersons became members of the jury. Therefore, African-Americans constituted 26% of the venire considered by both the State and defendant. In contrast, black jurors comprised 14% of the final jury of 14, which had two black members, including alternates. The State exercised one peremptory challenge against a potential juror who had a Hispanic surname. Assuming *arguendo* that Hispanic persons are considered white for *Batson* purposes (prior to the Supreme Court decision in *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (which held that a defendant may object to race-based exclusions of jurors whether or not the defendant and excluded jurors share the same race)), the State exercised only one peremptory challenge to the pool of 20 white potential jurors. Based on this data, we conclude that the State exercised a disproportionate number of peremptory challenges against black as compared with white potential jurors. In addition, we

find that the State's disproportionate use of challenges against black venirepersons contributed to the resultant low level of black representation on the jury.

Another factor which the court may consider in assessing whether or not defendant has established a *prima facie* case of racial discrimination in the selection of jurors is whether the excluded blacks were a heterogeneous or dissimilar group of people with varied backgrounds sharing race as their only common characteristic.

Here, the record reveals that the black prospective jurors excused by the State were indeed a heterogeneous group. Two of the black potential jurors were married, two were single and one was a widower. Three of the potential jurors were parents, two were not. Four of the potential jurors were employed. Their various occupations were social technician, special education teacher, general public school teacher and baking company employee. One juror was unemployed. Four of the jurors had never served on a jury before. One potential juror had been called for service, but not selected. Four of the jurors stated that neither they nor any friends or family members had ever been the victim of a crime. One potential juror indicated that he had been the victim of two automobile burglaries, but indicated that it would not affect his consideration of the case. Four of the potential jurors did not know any lawyers, doctors or judges. One juror stated that she knew a real estate attorney.

In contrast, among the white empaneled jury members there was a teacher, an electrical assembler, and a retired widow. In addition, two of the white jurors were single, four of the jurors or their friends or family members had been a crime victim, one had prior criminal jury service, and four of the selected white jurors had been called for prior jury service, but excused.

In sum, the potential black jurors excluded by the State were a heterogeneous group with their only common characteristic being their race. In addition, they shared common characteristics with several of the selected white jurors. The selection of white and the exclusion of black jurors who share common characteristics raises the inference that the black jurors were excluded on the basis of their race alone.

Some final factors to be considered are the prosecutor's remarks during *voir dire* and the race of the defendant, victim and witnesses. Here, the trial court conducted the *voir dire* so the prosecutor's limited remarks are not relevant. However, the record reveals that defendant is black, while according to defendant the victim and witnesses are white. The State disputes defendant's contention that the

victim and witnesses are white; that issue should be resolved upon remand. The State also argues that the race of jurors Bessie Chambers, Donna Lindsey and Lloyd Bingham is unknown. While a *prima facie* case of racial discrimination in the State's use of its peremptory challenges can be inferred from the other factors considered, the race of these three jurors is relevant and should be ascertained with further certainty upon remand.

The centrality of the jury system to our democratic form of government warrants vigilant and sensitive trial court supervision of the selection and empaneling of the petit jury. The prosecution can no longer be allowed to provide pretextual, nonsensical and irrelevant reasons in support of their exercise of peremptory challenges to exclude minority venirepersons. The trial court must evaluate the State's responses in light of the day-to-day realities of practice in the criminal courts of Illinois. The trial court should also consider the backgrounds of white jurors selected by the prosecution and be wary of the use of peremptory challenges to exclude blacks who share common characteristics with accepted white jurors. Racial discrimination in the selection of jurors offends the dignity of persons and the integrity of the courts. *Powers v. Ohio* (1991), 499 U.S. 400, ____, 113 L. Ed. 2d 411, 419, 111 S. Ct. 1364, 1366.

Considering these factors in light of the facts of this case, we conclude that the trial court's finding that defendant failed to establish a *prima facie* case of racial discrimination in the State's use of peremptory challenges is against the manifest weight of the evidence. Accordingly, this matter is remanded to the trial court for a *Batson* hearing.

Defendant next argues that the trial court erred when it refused to dismiss for cause jurors who were biased, thus forcing him to exercise his peremptory challenges to eliminate the jurors and to accept an unwanted juror. We disagree.

■ The trial judge is granted broad discretion in conducting and managing *voir dire*. (*People v. Edwards* (1988), 167 Ill. App. 3d 324, 328, 521 N.E.2d 185, 188; 107 Ill. 2d R. 234.) The determination of whether a prospective juror possesses the state of mind which will enable him or her to give the accused a fair and impartial trial rests within the sound discretion of the trial court. (*People v. Britz* (1989), 185 Ill. App. 3d 191, 200-01, 541 N.E.2d 505, 511.) The trial court's determination of whether prospective jurors can give the accused a fair trial should not be set aside unless that determination was contrary to the manifest weight of the evidence. (*People v. Johnson* (1987), 162 Ill. App. 3d 952, 953, 516 N.E.2d 343, 344.) In addition, a

conviction will not be reversed unless the trial court's abuse of discretion has denied defendant his right to an impartial hearing. *Johnson,* 162 Ill. App. 3d at 953.

Defendant contends that two jurors whom he excluded through the use of peremptory challenges should have been dismissed for cause. The first potential juror was Edward Dziubek. Defendant argues that Dziubek should have been dismissed for cause because his son worked for the child support division of the State's Attorney's office and two of his nephews were police officers. However, the record reveals that this juror's son's employment was not related to the prosecution of the present case. In addition, in response to the court's questioning, Dziubek indicated that he could be unbiased. The court's *voir dire* of Dziubek did not indicate that he was unable to be a fair and impartial juror in this case.

The second potential juror was Huey Nakamura. Defendant argues that Mr. Nakamura should have been dismissed for cause because he stated that he had been the victim of a car theft and, as a result, his automobile insurance premiums were expensive. However, the record reveals that when the trial court asked Nakamura if he could assess the trial testimony and determine its truth, he responded, "I will try, yes." Contrary to defendant's contentions, Mr. Nakamura's *voir dire* testimony did not demonstrate that he was unable to be a fair and impartial juror in this case.

■ Defendant argues that he suffered prejudice because his use of peremptory challenges to excuse Dziubek and Nakamura precluded him from excluding Jackson Link who sat on the final jury. Defendant argues that Link should have also been excused for cause because his prior service as a grand jury member and as a criminal jury member gave him a one-sided view of the criminal justice system. Defendant concedes that his assessment of Link's impartiality is merely speculative. However, mere speculation alone is insufficient to demonstrate a juror's bias. Because defendant cannot demonstrate either that Link was a biased juror or that he was prejudiced by his presence on the jury, we conclude that the trial court did not err in denying his motion to dismiss venirepersons Dziubek and Nakamura for cause.

■ Finally, defendant argues that the possession of stolen motor vehicle statute violates the due process and proportionate penalties clauses of the Illinois Constitution. We disagree.

In *People v. Bryant* (1989), 128 Ill. 2d 448, 539 N.E.2d 1221, the supreme court held that section 4—103 of the Illinois Vehicle Code does not violate the due process and proportionate penalties clauses of the Illinois Constitution. (Ill. Rev. Stat. 1985, ch. 95½, par. 4—103.)

The court found that section 4—103 applies to all persons, including organized motor vehicle thieves. The supreme court therefore concluded that the appellate court in *Bryant* erred in determining that possessors of stolen motor vehicles are punished more severely than organized motor vehicle thieves. The court reached this conclusion because all persons who possess a stolen motor vehicle, including organized motor vehicle thieves, are punishable under section 4—103(b) of the Code. (*Bryant*, 128 Ill. 2d at 456.) The court also concluded that the steady increase in the penalty provision for possession of a stolen motor vehicle was indicative of the legislature's intent to make possession of a stolen motor vehicle a separate, more serious offense than theft, rather than a lesser included offense of theft. (*Bryant*, 128 Ill. 2d at 457.) Since the supreme court has upheld the constitutionality of section 4—103 of the Illinois Vehicle Code, we reject defendant's argument.

For all of the foregoing reasons, this matter is remanded to the circuit court for a *Batson* hearing. Because we find that defendant has established a *prima facie* case of racial discrimination in the State's use of peremptory challenges, upon remand, the State must come forward with neutral explanations sufficient to rebut defendant's *prima facie* case. If the State fails to come forward with neutral explanations, the defendant's conviction is vacated and defendant is to receive a new trial. If, however, the State presents what is determined by the trial court to be neutral explanations sufficient to rebut defendant's *prima facie* case of racial discrimination, the defendant's conviction is affirmed.

Remanded with directions.

CERDA, P.J., and WHITE,* J., concur.

---

*Justice White participated in this opinion prior to his retirement.