THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHAWN HOLMES, Defendant-Appellant.

First District (5th Division) No. 1—93—0568

Opinion filed May 26, 1995.

Rita A. Fry, Public Defender, of Chicago (Kyle Marie Wesendorf, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James Navarre, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COUSINS delivered the opinion of the court:

Following a jury trial, defendant, Shawn Holmes, was convicted of first degree murder. The trial court subsequently sentenced defendant to serve a term of 38 years in the Illinois Department of Corrections. On appeal, defendant contends that: (1) the trial court erred in determining that defendant failed to establish a *prima facie* case of an impermissible racially based peremptory challenge; and (2) the trial court's sentencing of defendant to serve a term of 38 years was excessive and should be reduced.

We affirm in part and remand in part, with directions.

BACKGROUND

On January 8, 1991, defendant was charged by indictment with first degree murder for the killing of the victim, Gregory Guest, on December 16, 1990.

During the *voir dire* of prospective jurors, when the State exercised its first peremptory challenge against prospective juror Mrs. India Nichols, defendant claimed that the peremptory challenge was impermissibly based on Mrs. Nichols' race and motioned the trial court to require the State to indicate the reason for excluding her. In so doing, defendant maintained that, other than Mrs. Nichols' membership in the NAACP,[1] there was no other reasonable explanation for her exclusion. The State, however, responded that it did not have to give any reason for the exclusion because defendant had not sufficiently demonstrated a *prima facie* case of an impermissible racially based peremptory challenge.

---

[1] The National Association for the Advancement of Colored People (NAACP) was founded in 1909 and its focus has traditionally been the equal treatment of African-Americans.

In response to defendant's motion, the trial court noted that up to that point in the jury selection there had been two African-American prospective jurors in the venire. The trial court denied the motion and determined that defendant had not established a *prima facie* case under *Batson* and made the following ruling:

"Mrs. India Nichols, she is a lady in her fifties, divorced for four years and she has six children and she listed her occupation as a housewife, parttime [*sic*] beautician and goes to persons homes.

She did state that as far as organizations or clubs, she belongs to the N.A.A.C.P. *Batson* requires a tendering of race neutral reasons if the person challenged is a member of a recognizable minority and obviously Mrs. Nichols is female Afro-American person. \*\*\*

I don't think that given the description that I have given thus far, that you have sustained your burden to require the prosecution to state its reasons for the exclusion under Batson versus Kentucky. I will say that the person excluded, although she shares many characteristics in her background with those that are accepted by both sides, excluding race, she is one of the few people who stated that she was divorced and she is the only one who stated that she belongs to that particular organization, N.A.A.C.P."

At the end of jury selection, 12 jurors and 2 alternates were selected by both parties.

At trial, Officer Sam Wilson testified that on December 17, 1990, he and his partner were on patrol in a marked police car. At approximately 1:30 a.m. on that date, he and his partner responded to a call informing them that a man had been shot at the corner of 84th and Parnell Streets. When they arrived on the scene, Officer Wilson observed a brown BMW on an embankment facing east on the corner of 84th and Parnell Streets. The car was still running and was full of bullet holes. He noticed that the driver's passenger side window was shot through. The driver's door was open at the time, and the victim was lying on the ground, bleeding. He checked the victim's body and found that it was still breathing a little. However, when he checked the victim's pulse, he could not feel a pulse and concluded that the individual had expired.

Mr. Thomas Bachelder, an evidence technician for the Chicago police department, testified that, on December 17, 1990, he was working as a member of the mobile crime unit and received an assignment at approximately 2 a.m. directing him to go to the corner of 84th and Parnell Streets. He photographed the scene and searched for firearms evidence. He found seven 9-millimeter cartridge cases, one fired bullet, and eight metal fragments. He testified that casings

found at the scene were from a 9 millimeter semi-automatic weapon. He also found a .32 revolver under the driver's seat of the BMW. He examined the revolver and did not find any spent casings inside the revolver.

Officer Robert Blackman testified that at approximately 1:30 a.m. on December 17, 1990, he and his partner were on patrol duty in a marked police car. At that time, they were going westbound on 83d Street and were proceeding to take their car to the garage for repairs when they observed a two-door Ford Probe in the eastbound lane run through a stop sign. In response, they turned their patrol car around, activated their emergency equipment, and signaled the driver of the car to stop.

The car, however, ran another stop sign and then made a left turn onto northbound State Street. Officer Blackman and his partner also turned left and proceeded north on State Street. As they were traveling north on State Street, when they arrived at approximately 8219 South State Street, Officer Blackman saw a gun and a white bundle thrown from the passenger window. The vehicle continued north on State Street and eventually came to a halt at approximately 7951 South State Street.

The officers told the four passengers, including defendant, to exit the vehicle. Defendant had been in the back seat on the passenger side. After the officers conducted a pat-down search of the passengers, the officers monitored a radio call of a man shot at 84th and Parnell Streets.

An assist car arrived consisting of Officer Watkins and his partner. Officer Blackman told the officers about what he had seen thrown from the vehicle, gave them the location, and asked them to return to the location to retrieve the items. After going to the location, the assisting officers returned with a gun which they found in the area that Officer Blackman had directed them to. Officer Blackman testified that the gun recovered was a 9 millimeter semi-automatic weapon which is capable of firing between 30 and 34 rounds.

Officer Robert Watkins testified that when he and his partner arrived, Officer Blackman and his partner had four suspects in their vehicle. At the request of Officer Blackman, Officer Watkins then went to the area around 82nd and State Streets in search of a firearm and a white package thrown out of the Ford Probe. At 8219 South State Street, he found an automatic weapon on the ground against the curb. Officer Watkins also observed a large number of clean, white napkins lying on the ground approximately two to three feet from the weapon.

Detective Thomas Krippel testified that he had two conversations with defendant. Later that day, after his second conversation with defendant, Detective Krippel contacted the felony review unit at the Cook County State's Attorney's office. Shortly after 11 a.m., Assistant State's Attorney Michelle McDowell of the felony review unit arrived. After he spoke with her briefly, she went in to speak with defendant and the other individuals in custody.

Dr. Fuksel Konakci, a forensic pathologist working as an assistant medical examiner in the Cook County medical examiner's office, testified that he performed an autopsy on the victim's body. He observed that the victim's body had seven gunshot wounds. Dr. Konakci testified that multiple gunshot wounds were the cause of the victim's death.

Officer Robert Smith, an expert in the field of firearms examination and tool mark comparison, testified that he tested the 9 millimeter semi-automatic weapon which was recovered on State Street and concluded that two of the bullets recovered from the murder scene were suitable for comparison and that both bullets had been fired from the same gun. He further testified that he tested the three bullets submitted from the medical examiner's office following the victim's autopsy and concluded that they had also been fired from the gun recovered that evening.

Detective John Leahy testified that in the morning hours of December 17, 1990, after speaking with some of the individuals in custody, he went to look for two other individuals, Joe Ellebb and Omar Moore. He went to the home of Omar Moore's father, who told him that Omar was not home at the time and that even though Omar did not own a Continental, he did, and it was parked in the back of the house.

Detective Leahy inspected the car and discovered that it had a bullet hole in the passenger side door right below the mirror. Later that afternoon, he subsequently found and arrested Omar Moore and Joe Ellebb.

Assistant State's Attorney Michelle McDowell Simmons testified that shortly before 11 a.m. on December 17, 1990, she was assigned to the felony review unit of the Cook County State's Attorney's office when she received an assignment to go to the police station. She had two conversations with defendant that each lasted for approximately 20 minutes. After the second conversation, she asked defendant if he would be willing to make a written statement. Defendant told her that he would be willing to make a handwritten statement and she later prepared a four-page statement. Defendant made two corrections, initialled the corrections and then signed the statement. Detective Krippel was present and also signed the statement.

Assistant State's Attorney McDowell Simmons then read the statement into evidence. In the statement, defendant stated that at approximately 12 midnight on December 17, 1990, he was at a friend named Andre's house when an individual named Omar called and said that he had been robbed. Omar eventually arrived at Andre's house and showed defendant the bullet holes in his car and then asked defendant and the others who were there to go with him to help get his stuff back. Defendant got into a car with Omar and two other individuals. The others got into Omar's car and drove along with them. As they were driving, Omar told them about the robbery.

They drove to the corner of 84th and Parnell Streets, and defendant got out of the car with Omar. Omar unlocked the trunk and took out a machine gun. A BMW drove up and Omar began to talk with the driver and then began to argue with him. Defendant then shot at the BMW and the driver began to pull away, but the car stalled when it hit a curb. Defendant walked to the side of the BMW, took seven or eight shots and, after seeing that all of the windows were shot out, got back inside of the car with the gun. Omar then got into the other car and drove away. The car which defendant was in began to follow Omar's car, and they all noticed that a police car was following them. Defendant still had the gun so, when they got to the area around 82nd and State Streets, another passenger opened the window so that defendant could throw out the gun. The car pulled over at the corner of 79th and State Streets, where they were arrested and handcuffed by the police. Defendant stated that he did not know the victim.

The State then rested its case in chief. Defendant moved for a directed verdict on his behalf which the court denied.

Ms. Edna Holmes, defendant's mother, testified on behalf of defendant. She testified that, at approximately 6 p.m. on December 17, 1990, she arrived at the police station but was not allowed to speak with defendant on that evening.

Defendant then testified on his own behalf. He testified that on December 16, 1990, he was 17 years of age and that, on that evening, he was at a friend's house from approximately 8:30 p.m. until 10 p.m. According to defendant, he had been drinking about a pint of gin and Hennessey while at the friend's house on that evening. Although Omar Moore and Joe Ellebb came over, he did not have a conversation with either of them. At approximately 10 p.m., he went for a drive in a Ford Probe with three other individuals, not including Omar Moore or Joe Ellebb. Omar Moore and Joe Ellebb accompanied the others and left in a Lincoln Continental. When the two cars arrived at 84th and Parnell, both cars came to a stop near some railroad tracks where Omar directed them to park.

Defendant testified that Omar got out of the other car, and soon after, a BMW and a Suzuki drove up. There was one person in the BMW and three or four in the Suzuki; those in the Suzuki got out of the car. The people who had left the Suzuki and Omar walked over to the BMW. He was unable to describe any of the details of the three or four people who got out of the Suzuki. Omar and the person in the BMW began arguing and gunshots broke out. Defendant testified that he remained in the car the entire time, that he did not have a gun, and that he did not fire a gun. He testified that the Ford Probe then drove off towards State Street and that he was riding in the back passenger seat. While on State Street, defendant saw the Lincoln Continental pass by on the other side of State Street. Defendant testified that he never threw a gun out of the window of the Ford Probe, but that he did see something white thrown out of the Lincoln.

Although defendant admitted speaking to assistant State's Attorney McDowell Simmons, he testified that at no time did he tell her that he shot and killed the victim or that he took a gun and shot into the BMW seven or eight times. He stated that he signed the statement because the police, the assistant State's Attorney, and everybody that was at the station told him that if he cooperated with everything, they would allow his mother to pick him up and take him home, but that if he did not cooperate he would not be able to see his daughter for a long time. Before signing the statement, he had been in the police station for approximately nine hours and was tired of sitting in the police station. Defendant also testified that he had not known the victim, nor had he ever had a conversation with him.

The defense then rested its case.

Following closing arguments, the jury found defendant guilty of first degree murder. A motion for a new trial was denied. The trial court sentenced defendant to serve a term of 38 years in the Illinois Department of Corrections. This appeal followed.

OPINION

I

Initially, defendant contends that the trial court erred in determining that defendant did not establish a *prima facie* case of an impermissible racially based peremptory challenge under the standards set forth in the United States Supreme Court's decision in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. We agree.

Defendant points out that Mrs. Nichols had characteristics which would appear to have been desirable for the prosecution and which were shared by jurors accepted by both sides, but that the reason given by the trial court for determining that defendant had not established a *prima facie* case was that Mrs. Nichols was the only person in the venire who was a member of the NAACP. Defendant argues that this reason is in and of itself an impermissible racially based reason which cannot support the trial court's decision that defendant had not established a *prima facie* case. Defendant maintains that relying on the fact that Mrs. Nichols was a member of an organization whose membership is predominantly composed of members of defendant's race is indicia of invidious intent to discriminate based on race in violation of *Batson* and that relying on membership in the NAACP as a reason for permitting the exclusion of a juror is no less an indicia of intent to discriminate when it is offered by the trial court than when offered by a prosecutor.

In response to defendant's contention that the trial court impermissibly relied upon the excluded individual's membership in the NAACP in rendering its decision, the State contends that there is no basis for imputing the trial court's comments to the State and that there is nothing in the record which reveals that the State relied upon this fact in exercising a peremptory challenge.

The State also claims that the record reveals that at least three out of four African-American members of the venire were eventually chosen to serve on the jury and that there were several neutral reasons which could have legitimately accounted for the exclusion of Mrs. Nichols, namely that: (1) she was divorced; (2) she was the mother of a child close in age to defendant; and (3) she lived in the same general area of the crime.

In *Batson*, the United States Supreme Court concluded that the equal protection clause of the fourteenth amendment prohibits a prosecutor from using the State's peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely because of their race. (See *Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 83, 106 S. Ct. at 1719.) In order to establish a *prima facie* case of racial discrimination in jury selection under *Batson*, a defendant can rely on the fact that the peremptory-challenge system facilitates any intended discrimination and by showing that: (1) defendant belongs to a racial group which is capable of being singled out for disparate treatment, *i.e.*, a "cognizable racial group"; (2) the State removed members of the defendant's race from the venire by using peremptory challenges; and (3) these facts and "any other relevant circumstances raise an inference" of purposeful discrimination based on

race. (See *Batson*, 476 U.S. at 93-96, 90 L. Ed. 2d at 85-88, 106 S. Ct. at 1721-23.) In the present case, since the parties agree that the first two elements of a *prima facie* case under *Batson* have been met, our inquiry is focused on whether any other relevant circumstances raise an inference of purposeful racial discrimination in jury selection.

In considering a *Batson* claim, the trial court must be mindful that the exclusion of just one minority venireperson for racial reasons is unconstitutional and provides sufficient grounds for reversal. (See *People v. Nicholson* (1991), 218 Ill. App. 3d 273, 278, 577 N.E.2d 1313.) Once a defendant establishes a *prima facie* case under *Batson*, the burden then shifts to the State to come forward with a race-neutral explanation for the challenge. (See *Nicholson*, 218 Ill. App. 3d at 278.) The standard of review to be applied in determining whether the trial court erred in determining that defendant failed to establish a *prima facie* case of purposeful racial discrimination in jury selection is whether the decision was against the manifest weight of the evidence. (See *People v. Henderson* (1990), 142 Ill. 2d 258, 287, 568 N.E.2d 1234; *Nicholson*, 218 Ill. App. 3d at 279.) For the following reasons, we reverse the trial court's decision that defendant had failed to establish a *prima facie* case of racial discrimination in jury selection under *Batson* and remand the cause for further proceedings consistent with this opinion.

The record reveals that Mrs. Nichols, a black female, lived on the south side of Chicago. She worked as a beautician and was divorced with six children: one was school age, one was a teenager, and the other four were adults. Her teenager was 15, living at home and enrolled in public school; and of her adult children, one was a housewife, one was employed in an administrative capacity at an in-State university, another was employed at a public hospital, and the other one was unemployed. She had one friend who was a police officer, but she had never discussed police work with that friend. She had never been an accused, complaining witness, or other witness in a criminal case before. She stated that once she was the victim of an armed robbery and that she had a cousin who was also the victim of an armed robbery. She stated that there was nothing about these incidents which would prevent her from giving both sides an impartial trial. When asked whether she belonged to any clubs or organizations, she indicated that she belonged to the NAACP. She stated that she would be an impartial juror.

The record also reveals that of the original panel of 24 prospective jurors, the jury was composed of the following people:

(1) Sylvia Kaplan was married and lived in a condominium in a northern suburb and was a retired bookkeeper. She and her

husband had three adult children: one son was employed as a teacher at the college level, one daughter employed as a bank account executive, and one son employed in a supervisory capacity for a company that makes salads. She stated that she belonged to the National Council of Jewish Women.

(2) Leo Binkowski was married with no children and lived in a western suburb. He was employed as a grade school teacher for a school district. He stated that he belonged to the men's club as well as a bowling league and he coached sports teams.

(3) Harold Kumelehne was widowed and lived in a southern suburb. He was a retired railroad worker. He had seven children. He stated that he belonged to the Moose Lodge.

(4) Michael Donahue was married and lived in a northern suburb. He was employed as a sound engineer for a theatrical stage group. He did not belong to any clubs or organizations.

(5) Trina Sefcheck was married and was living on the near west side of Chicago as a retired housewife. She did not belong to any clubs or organizations, but in the past she was active in several organizations for retarded children as well as for orphan children.

(6) Wellman Hoff was married and lived in a northwest suburb. He was employed as an accountant. At the time of the *voir dire*, he was a plaintiff in a personal injury case which was pending. He stated that he was a member of a local Rotary club.

(7) Addie Mays was single and lived on the south side of Chicago. She was employed in the cleaning department of a local hospital. Before working at the hospital, she worked at a factory for 25 years. She had two adult children: a son who worked for the post office and a son who worked for the city. She did not belong to any clubs or organizations.

(8) Anneliese Bayer was married and lived on the north side of Chicago. She was employed as a food preparer in the flight kitchen at O'Hare International airport. She did not belong to any clubs or organizations.

(9) Sherry Olsowski was single and lived on the northwest side of Chicago. She was employed as a tax accountant. She stated that she belonged to the National Society for Cooperative Accountants.

(10) Shirley Manning was single and lived on the south side of Chicago with her four children who were all in public school: two were in high school and two were in grade school. She was employed as a floral designer for Jewel. She did not belong to any clubs or organizations.

(11) Howard Kacsh was married and lived in a northwest suburb. He was employed as a salesman for a produce company. He stated that he was a member of the Northwest Suburban Jaycees.

(12) Marie Patricia Burke was single and lived on the northwest

side of Chicago. She was employed as a product manager for a candy company. She did not belong to any clubs or organizations. The following two alternate jurors were also selected:

(1) James Fury was married and lived in a northwest suburb. He was employed as a junior high school teacher. He stated that he was a member of professional organizations.

(2) Fred Goldman was widowed and lived in a northwest suburb. He was employed in private practice as a certified public accountant. He was a member of several professional organizations.

On the day of the trial, the trial court excused Marie Patricia Burke and replaced her on the jury with James Fury, leaving Fred Goldman as the sole alternate.

■ The record does not mention the race of each juror and alternate in the case. However, the record does reflect that Mrs. Nichols had substantially the same characteristics as other accepted members of the venire except for her race or her membership in the NAACP. We note, in particular, that Sylvia Kaplan belonged to the National Council of Jewish Women, Harold Kumelehne belonged to the Moose Lodge, Wellman Hoff belonged to a Rotary club, and Howard Kacsh belonged to the Northwest Suburban Jaycees. Therefore, we conclude that defendant sufficiently established a *prima facie* case of racial discrimination in the jury selection process. The selection of white jurors and the exclusion of even a single black juror sharing common characteristics raises the necessary inference that the black juror was excluded solely on the basis of race. See *Nicholson*, 218 Ill. App. 3d at 284.

Significantly, the NAACP is an organization which can be identified with race. That fact, when viewed in combination with the fact that Mrs. Nichols was an African-American, makes her exclusion race specific where others with substantially similar characteristics are accepted. (See *Somerville v. State* (Tex. App. 1990), 792 S.W.2d 265, 268-69.) In *Somerville*, the court of appeals of Texas held that a prosecutor's explanation of the exclusion of a potential juror because of the individual's membership in the NAACP was not a race-neutral reason for the exclusion and thus insufficient to sustain a prosecutor's intermediate burden of production under *Batson*. (See *Somerville*, 792 S.W.2d at 268-69.) The court reasoned that, *inter alia*, because membership in the NAACP relates to race and is thus race specific, a court would appear to condone racial discrimination if it were to accept a potential juror's membership in the NAACP as a racially neutral explanation for the prosecution's peremptory strike of that individual. See *Somerville*, 792 S.W.2d at 268-69.

We find the reasoning in *Somerville* to be instructive and

conclude that because, aside from her membership in the NAACP, Mrs. Nichols' characteristics were substantially the same as those of several of the accepted jurors, defendant sustained his burden of establishing a *prima facie* case of racially discriminatory jury selection under *Batson.* The State now has the burden of coming forward with a race-neutral reason for the exclusion.

Moreover, in recognizing the constitutional evil of racial discrimination in the jury selection process, the United States Supreme Court in *Batson* explained:

> "The *petit jury has occupied a central position* in our system of justice by *safeguarding* a person accused of crime *against the arbitrary exercise of power by prosecutor or judge.* [Citation.] Those on the *venire must be 'indifferently chosen,'* to secure the defendant's right under the Fourteenth Amendment to 'protection of life and liberty against race or color prejudice.' [Citation.]
>
> ***
>
> The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. *Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice.* [Citations.] Discrimination within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others.' [Citation.]" (Emphasis added.) *Batson,* 476 U.S. at 86-88, 90 L. Ed. 2d at 81-82, 106 S. Ct. at 1717-18.

The State argues that there were several race-neutral reasons which could have accounted for the exclusion. However, we conclude that these reasons are irrelevant at this stage because the issue at this point is not whether there were any legitimate race-neutral reasons for the exclusion, but rather whether defendant had sufficiently established a *prima facie* case under *Batson.* In addition, even though the State asserts that the record reveals that at least three out of four African-Americans in the venire were eventually accepted, that fact without more is not controlling because, under *Batson,* the exclusion of even one member of the venire because of his or her race is unconstitutional and requires reversal. (See *People v. Andrews* (1993), 155 Ill. 2d 286, 294, 614 N.E.2d 1184.) As such, we remand this cause for further proceedings.

## II

Next, defendant contends that the trial court's imposition of a 38-year sentence was excessive and constitutes an abuse of discretion and, as a result, the sentence should be reduced.

Defendant argues that because he was 17 years old at the time of the offense, had no prior criminal convictions or adjudications as a juvenile and showed potential for rehabilitation by devoting himself to school work, the trial court's 38-year sentence was excessive and constitutes an abuse of discretion and warrants a reduction in his sentence. Defendant maintains that, under the Illinois Constitution, the trial court is required to consider a defendant's rehabilitative potential before imposing a sentence.

The State, however, responds that in light of the senseless nature of the killing and the manner of the killing, as well as defendant's lack of remorse, the trial court properly exercised its discretion in imposing the 38-year sentence.

■ In Illinois, a trial court's determination as to the appropriate sentence is entitled to great deference and will not be disturbed on review absent a showing of an abuse of discretion. (See *People v. Illgen* (1991), 145 Ill. 2d 353, 379, 583 N.E.2d 515.) Where mitigation evidence is before the trial court, the trial court is presumed to have considered the evidence absent some indication, other than the sentence imposed, to the contrary. (See *People v. Canet* (1991), 218 Ill. App. 3d 855, 864, 578 N.E.2d 1146.) The 38-year sentence which the trial court imposed on defendant fell within the statutory range of 20 to 60 years for first degree murder. See 730 ILCS 5/5—8—1(a)(1)(a) (West 1992).

Therefore, for all of the foregoing reasons, the judgment of the trial court is affirmed in part and remanded in part for the trial court to conduct a *Batson* hearing. Since we hold that defendant has established a *prima facie* case of racial discrimination in the State's use of peremptory challenges, on remand, the State has the burden of coming forward with race-neutral explanations sufficient to rebut defendant's *prima facie* case. If the State fails to sustain its burden in this respect, defendant's conviction is vacated and defendant is to receive a new trial. (See *Nicholson*, 218 Ill. App. 3d at 287.) However, if the State presents race-neutral explanations sufficient to rebut defendant's *prima facie* case of racial discrimination in jury selection, defendant's conviction will stand.

Affirmed in part and remanded in part, with directions.

GORDON and T. O'BRIEN, JJ., concur.