THIRD DIVISION
June 30, 2010

No. 1-07-2516

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County, Illinois |
| Plaintiff-Appellee, | ) | |
| | ) | No. 04 CR 6151 |
| v. | ) | |
| | ) | Honorable William G. Lacy, |
| NICHOLAS GUTIERREZ, | ) | Judge Presiding |
| | ) | |
| Defendant-Appellant. | ) | |

PRESIDING JUSTICE MURPHY delivered the opinion of the court:

After a jury trial, defendant, Nicholas Gutierrez, was convicted of first-degree murder, aggravated criminal sexual assault, burglary, and concealment of a homicidal death. He was sentenced to natural life in prison. On appeal, defendant argues that: (1) his sentence is excessive; (2) his conviction for aggravated criminal sexual assault should be reversed because the State failed to prove that the victim was alive at the time of the sexual assault; (3) his conviction for burglary should be reversed because he had unlimited authority to be inside the funeral home; (4) the jury instructions constructively amended the burglary charge of the indictment; (5) the trial court erred in ruling that he failed to establish a *prima facie* case of racial discrimination during *voir dire*; and (6) the State made improper comments during closing and rebuttal arguments.

## I. BACKGROUND

Defendant, then 19 years old, was charged with first-degree murder, aggravated criminal sexual assault, burglary, concealment of a homicidal death, robbery, and armed robbery after the body of Mary Stachowicz was found under the floorboards of his apartment, which was located above the F.J. Sikorski Funeral Home. Defendant was convicted of all charges except robbery and armed robbery. The trial court found defendant eligible for the death penalty based on the murder during the commission of aggravated criminal sexual assault but sentenced him to natural life in prison for the murder, 30 years' imprisonment for aggravated criminal sexual assault, 7 years' imprisonment for burglary, and 3 years' imprisonment for concealment of a homicidal death, all sentences to be served concurrently. The following evidence was adduced at trial.

### A. Trial

#### 1. *Francine Sikorski*

Francine Sikorski owned the F.J. Sikorski Funeral Home, located at 3630 West George Street in Chicago, and lived in apartment 2 East above the funeral home. Defendant and Ray Scacchitti moved into the other apartment, 2 West, in December 2001. The stairwell to the apartments could be accessed through a door in the lobby of the funeral home; through a single door outside of the funeral home, just west of the main entrance on George Street; and through a stairwell in the backyard. Sikorski testified that she allowed them to live in the apartment rent-free in exchange for their services at the funeral home. Defendant and Scacchitti had keys to the front door of the funeral home and keys to their apartment.

1-07-2516

In the fall of 2002, defendant and Scacchitti stopped working at the funeral home. Sikorski testified that she asked defendant and Scacchitti to stop working and move out because she and Scacchitti were having personality conflicts. On cross-examination, Sikorski admitted that she "might" have told the police the night of the murder that she had fired defendant. Sikorski testified that she gave defendant the option of continuing to stay there; she further testified that she loved defendant, she talks to him almost daily, and she visits him weekly. Scacchitti and defendant began looking for another place to live and packing their belongings in boxes. After Sikorski told Scacchitti and defendant to move out, she expected that they would use the same two doors to that apartment, and they had the authority to do so.

About a month before her death, Mary Stachowicz began working part-time at the funeral home doing light cleaning and helping with Polish translations.

The morning of November 13, 2002, Christopher Stachowicz asked his mother, Mary, if he could borrow $10. When he was taking the money from her wallet, he noticed that there was a $10 bill and a $20 bill, as well as 5 to 10 other bills. He took the $10 bill, left the remaining bills, and returned the wallet to his mother's purse.

Sikorski testified that on November 13, 2002, Mary arrived at the funeral home at 8:30 a.m. There was a funeral at the church across the street at 10 a.m. At 10:50 a.m., Sikorski returned to the funeral home to pick up her belongings and then left for the cemetery. Mary stayed at the funeral home to answer the phones until Sikorski returned. Mary called her husband, Jerry, at 11 a.m. The caller ID for the funeral home's phone showed that a call came in on November 13, 2002, at 11:32 a.m., from the pay phone at the Chicago Transit Authority

-3-

(CTA) station at Belmont and Kimball.

Sikorski returned at 12:45 p.m. The front door to the funeral home was locked, and a man was standing outside with clothes for the next visitation. Sikorski looked through the funeral home but could not find Mary. She found Mary's purse and jacket on the chair in the arrangement room and her car was still in the parking lot. In addition, there was a clean dish and a dish towel on the table near Mary's jacket and purse.

Sikorski went to pick up her daughter in Wilmette at 2:45 p.m. and was gone for 45 minutes. When she returned, she called the church looking for Mary and went through Mary's purse looking for her husband's phone number. Sikorski called the rectory at St. Constance church, where Mary was scheduled to work later that day, and got her husband's number. At 3:50 p.m., Francine Sikorski called Jerry Stachowicz and told him that Mary was missing. Jerry and his son went to the funeral home, arriving at 4:30 p.m. Jerry discovered Mary's jacket, scarf, and purse sitting on a chair. Christopher looked in his mother's wallet and discovered that the billfold area was empty.

Jerry called the police and reported his wife missing. Mary's family and the police searched for her at the funeral home and the church across the street.

### 2. *Ray Scacchitti*

Scacchitti testified that he is homosexual and defendant is bisexual. In November 2002, he and defendant were living openly as a couple in an apartment above the funeral home. In January or February of 2002, shortly after Scacchitti and defendant moved into the apartment, they began working at the funeral home. Their wages would be deducted from their rent. In

October 2002, Sikorksi told Scacchitti and defendant that she did not want them working at the funeral home anymore. She also asked them to move out. After this time, neither Scacchitti nor defendant would "go into different rooms of the funeral home."

Soon after Sikorksi terminated Scacchitti's and defendant's employment, she hired Mary Stachowicz, whom Scacchitti knew from St. Hyacinth, the church across the street. Scacchitti testified that Mary knew he was homosexual and never confronted him or questioned his beliefs. However, defendant and the State stipulated that Angela Ruffolo, Mary's daughter, would testify that her mother did not like defendant and Ray and did not approve of their lifestyle.

The morning of November 13, 2002, defendant went with Scacchitti to Flower Fantasy, the flower shop where Scacchitti worked. When they arrived, Scacchitti gave defendant $4 to buy breakfast; defendant went to buy it and then ate while Scacchitti worked. After 10:30 a.m., defendant went with the flower shop owner's sister to a fruit store half a block away, where they bought fruit for a fruit basket. At 11 a.m., defendant left for the Harlem and Irving Plaza mall, where he was to look for a job, play video games, and eat lunch. Scacchitti gave him between $4 and $7. Scacchitti also gave defendant his cell phone.

After defendant left the flower shop, Scacchitti tried to reach him between three and five times. Defendant did not respond to any of those calls, which was unusual. At 3 p.m. he heard from defendant, who said he was on his way back to the flower shop. When defendant arrived at the flower shop, he was limping and there was blood on his temple. Defendant said he injured himself when he played basketball at the Norridge gym and that he cut his finger. Defendant gave Scacchitti $30, which he claimed that he won from the basketball game. Scacchitti never

knew defendant to have that much money.

Defendant changed into his Subway uniform in the bathroom of the flower shop and put the clothes he had been wearing in the van. Scacchitti took him to work some time after 4 p.m. He then returned to the flower shop and drove the owner's sister to Schiller Park. While he was trying to find the phone number for an apartment that was for rent, Sikorski called him and said that Mary was missing. Scacchitti went to the Subway where defendant was working and asked if he had been to the funeral home that day. Defendant responded that he had not. Because defendant was finished working, the two returned home.

Mary's family asked to search defendant and Ray's apartment. After sending defendant first to check on their pets, Scacchitti took Mary's son upstairs to their apartment.

On November 13 or 14, defendant burned incense while playing video games. On the 14th, when a story about Mary was on the television news, defendant said, "God doesn't let bad things happen to good people." Scacchitti testified that defendant's behavior was normal.

### 3. *Police*

Detective Kevin McDonald testified that on November 15, 2002, he spoke to defendant at the police station. Defendant gave the detective his CTA card. McDonald spoke to the Norridge Park District and asked CTA security to fax a printout of the activity on defendant's CTA card. McDonald confronted defendant with the information that the CTA card had been purchased at the Belmont-Kimball Blue Line station at 3:02 p.m. on November 13, 2002, and was used seconds later to board the subway at that station. It was then used at 3:43 p.m. to board a bus at the Cumberland station. McDonald also informed defendant that the outdoor basketball courts in

Norridge were closed at that time and that the indoor basketball court did not open until 3:30 that afternoon. To play basketball at the Norridge Park District indoor facility, defendant would have been required to sign in and pay $5 or have a resident pass. Defendant did not have such a pass. He told defendant that he would send detectives to the locations that he mentioned to see if they could get video surveillance to verify where he was.

Defendant responded that he wanted to tell the truth about what happened that day. Defendant stated that on November 13, 2002, he left the florist at 11:30 a.m. and took the El back to the funeral home, where he intended to play video games. As he walked on George Street approaching the funeral home, he saw two Hispanic men leave the front of the funeral home. He gave detailed descriptions of the two men. Defendant stated that he approached the men and asked if he could help them. They asked whether he knew Ray Scacchitti, and he replied that he did. The men responded, "If you tell anybody we were at the funeral home, we will kill you, Ray, and your pets." The larger man reached toward the small of his back, as if reaching for a weapon, but the other man stopped him. They left in a black Lincoln driven by a third man. Defendant then told McDonald that he entered his apartment and discovered that one of the rear windows was open and the safe that contained Scacchitti's jewelry had been moved. He took care of his pets and walked around to clear his head before taking the El back to the florist.

McDonald asked defendant what he thought happened to Mary with those people in the funeral home. Defendant responded that he believed the two men climbed up the garage and entered his apartment through the rear window. Mary probably heard as they moved the safe and threatened to call the police. The offenders probably left the apartment, grabbed Mary, and

dragged her back to the apartment so they would not get blood on the funeral home's carpet. Next, he believed that the men tried to gag Mary and ended up beating her to death when she violently fought back. They hid the body in the funeral home in an effort to incriminate defendant and Ray. Possible places to hide the body included the garage, air ducts in the basement, a rear office, and a space in the ceiling of the basement. He also noted a crawl space in the den of his apartment for radiator pipes. The space was covered by boards, a rug, a table, and a bust of Jesus. Defendant stated that he also remembered that there had been art books on the table and that they were moved. He surmised, therefore, that the body had been hidden in that crawl space. Defendant drew a map of his apartment showing the crawl space.

Detective John Callaghan testified that he checked the common areas of the funeral home, including the areas that defendant specified in his statement. They entered defendant's apartment when he consented to the search. They proceeded to the crawl space that defendant specified and found Mary's body. Her shirt was pulled up and her bra was protruding.

Detective Robert Rutherford left the funeral home at 7 p.m. on November 15, 2002, and returned to the police station, where he spoke to defendant. Defendant stated that he and Scacchitti were no longer working for the funeral home and were in the process of moving out of their apartment. On November 13, 2002, he went to the flower shop with Scacchitti and got into a disagreement with him about the path his life was taking. Defendant stated that he left the flower shop and returned to the apartment. He entered the apartment through the door on George Street that leads directly up the staircase to his apartment. When he opened the door, Mary opened the door to the staircase from the lobby of the funeral home and said, "Oh, it's you."

1-07-2516

Defendant gave her a disrespectful wave of his hand, as if to say, "Don't bother me," and continued up the stairs. He stated that Mary started to close the door, stopped, opened it back up, and asked, "Why do you fuck boys?" Defendant told her to "fuck off" and continued up the stairs.

Defendant stated that Mary followed him up the stairs and asked, "Why don't you like girls? Why do you fuck boys?" He entered his apartment and shut the door. He heard banging on the door and started to lose control. He opened the door, grabbed Mary by the hair, and dragged her into the apartment. She slapped and kicked him, and he let her go. He backed up into the dining room, and Mary followed him, asking, "Why don't you like girls?" He slapped Mary, and she slapped him back. As he continued backing up through the kitchen to the den, he "lost total control of himself." He punched Mary in her jaw, knocking her to the ground. He grabbed a knife that was on top of some boxes and stabbed her and hit her until he became exhausted. He saw red while he was stabbing and beating her. He sat there for 10 minutes to catch his breath, then he took Mary's pulse to see if she was alive. He did not feel a pulse, so he got three plastic bags and wrapped them around her head to stop the blood from going onto the floor.

He got a sheet off the couch in the front room and wrapped Mary's body in it. He hid her body in the crawl space below the den. He cleaned the floor and furniture using three rolls of paper towels and put the paper towels, as well as a blood-covered sheet from the couch, into a garbage bag. He went down the front stairs into the funeral home. As he walked through the funeral home, he saw Mary's purse out in the open. He took $85 from her purse, left through the

back door, hopped a fence, and walked down the alley, where he put the garbage bag into a garbage can. He walked to the El stop and went back to the flower shop. When he got to the flower shop, defendant gave Scacchitti $30 and told him he won it playing basketball. He changed into his work uniform and left his dirty clothes in the van.

Detective Robert Carrillo testified that on November 15, 2002, defendant asked him to take the $52 in his wallet and give it to Mary's family. Defendant stated that he was going to take that money, whatever he could steal from Ray, and any valuables from the funeral home to buy a ticket to Las Vegas.

Carrillo contacted the State's Attorney's office. Assistant State's Attorney Mark Hitt arrived at 10 p.m. and spoke to defendant. At the end of their conversation, defendant gave a videotaped statement, which was substantially similar to his statements to Rutherford and Carrillo. At the time defendant gave this statement, the autopsy had not been completed.

After defendant finished his videotaped statement, defendant asked if he could write Ray a note. Hitt gave defendant a pen and some paper and allowed him to write a note. When defendant was done, Hitt showed it to Detective Carrillo and then took it to Ray. In the note, defendant expressed his affection for Scacchitti and apologized for what he had done. He asked Schacchitti, "Please don't think of me as a monster."

On November 16, 2002, after learning the results of Mary's autopsy, Detective Carrillo told defendant that Mary's cause of death was strangulation. Defendant stated that after he beat and stabbed Mary until he was exhausted, he checked for a pulse and did not find one. He saw the telephone line for the funeral home lit up, suggesting that Francine had returned from the

funeral. He was afraid that Francine might be calling the police, so he decided to hide the body. He placed the bags over Mary's head and pressed down on the neck area for two minutes, hoping that the blood would coagulate and form a seal. The blood slowed down, and he placed the body in a blanket and then put the body in the floorboards. Defendant did not mention having sexual contact with Mary, and Carrillo did not ask because he was unaware at that point.

Assistant State's Attorney Julie Egan learned the results of the autopsy on November 16, 2002. She briefly spoke to defendant and told him that the cause of Mary's death was strangulation and asked if he knew anything about that. Defendant explained that he placed plastic bags over Mary's head to stop the bleeding, and when that did not work, he placed his hands around the victim's throat for two minutes.

#### 4. *Medical Examiner*

The medical examiner, Dr. Eupil Choi, found 11 superficial stab wounds on the back and right side of Mary's head and on her neck. The stab wounds were inflicted from behind. The wound to her neck struck the cervical bone and would have caused her to lose consciousness. It also would have caused the knife to bend. Ten of her ribs were fractured, and there were abrasions on her arms and elbows. She had numerous injuries indicative of strangulation, including bruising on her neck and the underside of her chin and fractured neck bones. The strangulation injuries were consistent with being strangled with the sheet that her body was wrapped in.

The doctor did not find any injuries to her vagina or rectum consistent with sexual assault, nor was her clothing ripped. He testified, however, that sexual assault can occur without

any injuries to the body. Further, Mary gave birth four times, and each time a woman gives birth, the elasticity of the vagina is reduced, which, in turn, makes vaginal injuries less likely. She also had rib fractures and a bruise to her groin, which are consistent with a sexual assault.

Semen was present in the vaginal and rectal swabs taken from Mary Stachowicz. The forensic scientist working on the vaginal swab inadvertently combined the male and female samples after they had been previously separated. As a result, no male DNA was found in the vaginal sample. Defendant could not be excluded as a contributor to the male profile from the rectal swab. Defendant's DNA was found on Mary's underwear.

Defendant's clothes containing Mary's blood were recovered from Scacchitti's van. A folding hunting knife with a bent tip was recovered from the living room of defendant's apartment. It contained both defendant's and Mary's DNA. The police also found a plastic bag containing blood-soaked towels and sheets in a nearby garbage can. Mary's DNA was found on the paper towels. There were no signs of forced entry into the funeral home or into defendant's apartment.

### 5. *Verdict*

The jury found defendant not guilty of robbery and armed robbery and guilty of burglary, murder, aggravated criminal sexual assault, and concealment of a homicidal death. Defendant waived a jury for the eligibility and death penalty proceedings.

### B. Sentencing

The State sought the death penalty on the basis that the killing happened during the commission of an inherently dangerous crime. The trial court found that defendant was eligible

to receive the death penalty on the basis of the aggravated criminal sexual assault.

During the next phase of the sentencing hearing, Sharon E. testified that in 1995, she was six years old and living at the Larkin Center, a residential home for children in Elgin, where defendant was also living. On Halloween, she was in the bathroom when defendant and two other boys entered. The boys put Sharon on top of the sink and defendant put his penis onto her vagina without penetrating it. Defendant stated that if she told anyone, he would kill her. She told a staff member that two boys were "messing" with her, but she did not implicate defendant at the time because she was afraid. Afterward, the staff told her she had to sleep on the couch. At night, when she slept on the couch, defendant would stand in front of her and look at her "crazy."

Linda Nordtvedt was defendant's therapist at the Larkin Center in 1995. When confronted about the incident involving Sharon E., defendant admitted only that he exposed himself. She observed visitations between defendant and his mother; their interactions were positive, and she found no cause for concern. Nordtvedt testified that defendant did not make much progress in his therapy because he only told her what he wanted her to hear and did not work on his issues. When he was released from the Larkin Center, his prognosis was poor based on behaviors he exhibited. For example, he had difficulty taking responsibility for his own actions, and he frequently ran away at the beginning of his stay there. In addition, there was an incident involving the sexual abuse of another resident. As a result, restrictions were placed on defendant for the safety of other residents.

In 1997, defendant was transferred to the juvenile sex offender program at Uhlich Children's Advantage Network, a residential program for children with severe behavior and

emotional problems. Ann Przybysz, a residential intake coordinator at Uhlich, conducted a violence screening with defendant as part of the intake process. During the screening, defendant reported carrying a knife as a weapon, using a weapon in a fight, robbing a parent and a stranger, and forcing his sister to have sex with him. He also reported that he saw a security guard get shot and killed at a mall and saw his mother beat his sister until she bled. His mother beat him until he was bleeding or knocked out. Further, he reported that his babysitter's friend forced him to have sex against his will.

Francisco Monzon, who was a residential case manager in 1997, testified that defendant was in the sexually aggressive program at Uhlich. His individual plan included no unsupervised contact with minors. While defendant was successful in the program initially, he began to run away frequently, was found with pornography in his possession, and committed theft while he was on the run. In September 1997, defendant, then 14, was charged with possession of lost or mislaid credit cards, which he gave to a fellow Uhlich resident. In October 1997, he was arrested for retail theft. Monzon reported that defendant was resistant to staff and stopped making progress in therapy. Defendant's visits with his mother were normal and did not cause Monzon any concern. Defendant was discharged from Uhlich because of his runaway behavior.

Lynda Moore, defendant's Department of Children and Family Services (DCFS) caseworker in 1999, testified that when she first took over defendant's case, he was placed at the Mill in Rockford, Illinois. The Mill was a residential placement for children with behavioral problems, and it provided services for juvenile sex offenders. Defendant, who was 15 at the time, lacked progress there. He was sexually inappropriate with both peers and staff, and he

fondled another student. He also broke into the chief executive officer's office at the Mill, where he accessed confidential student information, stole and broke items, and made long-distance phone calls. He was convicted of burglary and property damage for this incident and sentenced to 18 months' probation. He also ran away to high-risk areas, including the parking lot of a school that developmentally challenged children attended. Defendant had fantasies about raping women in parking lots; once, he was found crouched between cars in a parking lot with a crowbar. The Mill asked to have defendant removed and placed in a more restrictive environment because he was at "high risk of sexual re-offense" and he "terrified" the women at the Mill.

The only placement more restrictive than the Mill is a locked facility; however, there were none in Illinois that would accept defendant. Moore found defendant, then 16, a placement at Piney Ridge, a locked, out-of-state facility for children with psychiatric issues and juvenile sex-offender behaviors. At first, defendant did well at Piney Ridge, as he moved up the level system quickly and gained the trust of his therapist. However, he ran away when he was assigned the task of taking out the trash. Defendant was discharged from Piney Ridge with a poor prognosis after he engaged in inappropriate sexual conduct with a peer. Defendant got mad at the peer and threatened to slash his throat.

Moore found one private agency in Illinois that was willing to take defendant. Defendant was transported to Onarga Place but was rejected because of his runaway behavior. Moore had no choice but to take defendant to a DCFS emergency shelter for the night. A couple of hours later, he ran away, and Moore never saw him again. Moore stated that she was afraid of

defendant.

Christiana Largent, defendant's younger sister, also testified in aggravation. Largent is four years younger than defendant. For the first four years of her life, she lived with her mother and defendant. When Largent was three, her mother hung her out a window to eliminate her fear of heights. Her mother also wanted defendant to hang Largent out the window, but he refused. During this period of time, their mother physically abused defendant. However, their mother did not sexually abuse her or expose her to sexual abuse. When Largent was four and defendant was nine, their mother broke a whiskey bottle over Largent's head. They were removed from their mother's home and placed in a group home called Hephzibah. Defendant was moved to another home a week later, while Largent stayed at Hephzibah until she was 10. Largent testified that her mother tried to visit when she could. When Largent was 11, she returned to her mother's home, and in 2003, they moved to Alabama. Largent testified that, to her recollection, defendant did not sexually abuse her before they were removed from their mother's home.

While defendant was in jail, he was charged when the entire tier was involved in a fight. Defendant stated that he was writing a letter on the top tier when the fight occurred. After a hearing, he was found guilty of fighting and was sentenced to 14 days in disciplinary segregation. In another incident, defendant was charged with participating in a riot in the prison gym. After a hearing, defendant was found guilty and was sentenced to 29 days in segregation.

In mitigation, the parties stipulated that Dr. Paul Batty would testify that he examined Sharon E. in the emergency room of St. Joseph's Hospital on November 1, 1995, and that his physical examination revealed no signs of trauma. He would further testify that Sharon E. denied

that the boys touched her private parts with their hands, touched her with their private parts, or removed her underwear.

The parties also stipulated that Melody E., Sharon E.'s mother, would testify that during her visit with Sharon after the Halloween of 1995, she stated that "them boys touched me" and that she never mentioned defendant's name.

David Berg, a forensic interviewer for the Child Advocacy Center in Kane County, testified that he interviewed Sharon E. on November 6, 1995. Sharon told him that three boys pulled down her pants and touched her private part. While she named Chris, Ray, and TK, she did not mention defendant. He testified that she was evasive and anxious and it was difficult to talk to her. He interviewed defendant, who denied involvement but was "overly eager" to implicate the other three boys.

Carol Garza testified that she was friends with Paula Largent, defendant's mother. In the 1980s, Garza and Largent worked at a lounge owned by Hector Gutierrez. While Hector was married, he had an affair with Paula; as a result, Paula became pregnant with defendant. Shortly after defendant was born, he and Paula lived with Garza and her family. Hector continued living with his wife. After a year, Paula moved to an apartment building owned by Hector's parents. While they worked at the lounge, Carol and Paula became alcoholics and cocaine addicts. They partied three or four times a week, frequently at Paula's apartment. Defendant was at the apartment sleeping while this occurred; however, he would wake up now and then. Paula would yell at defendant when he came out of his room while they were getting high. One time, Paula backhanded defendant because he came out of his room crying, and a few other times, she

slapped or spanked him for leaving his room or for crying. Another time, Paula strapped him to his high chair with a belt. His bedroom door was kept locked from the outside by either a belt or a clothes line while Paula and others got high. Carol also witnessed one of their drug dealers fondle defendant's crotch while he was lying on the couch wearing pajamas and a diaper. Defendant, then two or three, woke up crying. In addition, Carol saw Peto, an associate of their drug dealer, swipe his penis across defendant's mouth while he was sleeping. When defendant woke up, Peto took defendant to his bedroom, where they remained for 10 to 15 minutes. Carol did not remember whether the door was open or closed or whether Peto and defendant were alone in the bedroom. At some point during the 1980s, Paula told Carol that she paid for drugs by selling defendant for sex. Carol did not do anything to stop it, nor did she tell the authorities.

Grace Gorski testified that she was friends with Ray and defendant. She loved defendant and was supportive of him. She trusted defendant and found him to be charming.

Colleen Luckey owned the jewelry store next to Flower Fantasy. She met Scacchitti in 2000 and then met defendant through Scacchitti. She found defendant to be charming, pleasant, and helpful.

Sergeant Michael Hallihan testified that defendant started on the school wing in the jail and moved to the "Christian deck," where chaplains held Bible readings and worked with inmates on drug-abuse or anger-management issues. A stricter set of rules applied to the Christian deck.

Valerie Scacchitti, Ray's sister, testified that before the murder, she saw defendant and Ray once a week. She considered defendant family and found him to be a "gentle soul."

The trial court sentenced defendant to life imprisonment for first-degree murder; 30 years' imprisonment for aggravated criminal sexual assault; 7 years for burglary; and 3 for concealment of a homicidal death. Defendant's posttrial motion was denied, and this appeal followed.

## II. ANALYSIS

### A. Aggravated Criminal Sexual Assault

1. *Whether the State Must Prove the Victim Was Alive at the Time of the Assault*

Defendant argues that the crime of sexual assault requires that the State prove that the victim was alive at the time of the sexual acts. He contends that his conviction for aggravated criminal sexual assault must be reversed because the State failed to prove that Mary was alive at the time he assaulted her.

In support of his argument, defendant cites *People v. Segara*, 126 Ill. 2d 70 (1988), which held, "To the victim, each rape was 'readily divisible and intensely personal; each offense is an offense against *a person*.' " (Emphasis in original.) *Segara*, 126 Ill. 2d at 77, quoting *Pruitt v. State*, 269 Ind. 559, 565, 382 N.E.2d 150, 154 (1978). The question in that case, however, was whether the defendant was liable for two acts of criminal sexual assault, not whether the State must prove that the victim was alive at the time of the rape. Further, the Illinois criminal sexual assault statute does not specifically require a living victim. 720 ILCS 5/9-1(a)(3), 12-12(f), 12-13(a)(1), 12-14 (West 2006).

Further, *People v. Hendrix*, 250 Ill. App. 3d 88 (1993), refutes defendant's contention. In

*Hendrix*, the body of the 71-year-old victim was found 30 to 48 hours after death, and the defendant was convicted of first-degree murder, aggravated criminal sexual assault, and burglary. On appeal, the defendant argued that he was not proven guilty of aggravated criminal sexual assault because the medical examiner could not conclusively establish that any sexual assault occurred before death. This court concluded that "we will not draw a bright line which would require the State in all similar cases to establish the precise time of death in order to prove a sexual assault upon a murder victim." *Hendrix*, 250 Ill. App. 3d at 103. Accordingly, the court concluded that the State proved defendant's guilt beyond a reasonable doubt. *Hendrix*, 250 Ill. App. 3d at 103.

*Hendrix* relied on *People v. Colley*, 188 Ill. App. 3d 817 (1989). In *Colley*, the defendant argued that he was not proven guilty of aggravated criminal sexual assault because the victim's stab wounds occurred too long after the sexual acts were performed to be considered part of the same course of conduct. The court noted that the evidence showed that the defendant stabbed the victim soon after the sexual acts were completed. *Colley*, 188 Ill. App. 3d at 820. "Under the instant circumstances, we will not draw a bright line between the ending of the sexual acts and the bodily harm occurring afterward, as that would defeat the statutory purpose of protecting victims from sex offenders." *Colley*, 188 Ill. App. 3d at 820. The court found that the stab wounds occurred "sufficiently close in time to the sexual acts that they can be said to have been committed during the course of the sexual assault." *Colley*, 188 Ill. App. 3d at 820, citing *People v. Ortiz*, 156 Ill. App. 3d 170 (1987).

Defendant cites cases from other jurisdictions that have held that the crime of rape

requires that the victim be alive at the time of the sexual act. See *Doyle v. State*, 112 Nev. 879, 899, 921 P.2d 901, 914 (1996), *rev'd on other grounds by Kaczmarek v. State*, 120 Nev. 314, 91 P.3d 16 (2004); *People v. Davis*, 10 Cal. 4th 463, 521 n.20, 896 P.2d 119, 151 n.20, 41 Cal. Rptr. 2d 826, 858 n.20 (1995); *State v. Perkins*, 248 Kan. 760, 771, 822 P.2d 1142, 1150 (1991); *State v. Holt*, 128 Wis. 2d 110, 121, 382 N.W.2d 679, 685 (1985); *Commonwealth v. Sudler*, 496 Pa. 295, 303, 436 A.2d 1376, 1379-80 (1981); *Rogers v. State*, 890 P.2d 959, 969 (Okla. App. 1995); *People v. Hutner*, 209 Mich. App. 280, 283-84, 530 N.W.2d 174, 176 (1995). "These courts reason that rape must be accomplished against a person's will, and once one is dead has no will which can be overborne." *Missouri v. McLaughlin*, 265 S.W.3d 257, 270 (Miss. 2008), citing *People v. Sellers*, 203 Cal. App. 3d 1042, 1050, 250 Cal. Rptr. 345, 350 (1988). Defendant, urging this court to follow those cases, contends that a separate criminal offense of mutilation or sexual abuse of a corpse is more appropriate than a conviction for criminal sexual assault.

We note, however, that a different panel of the Michigan Court of Appeals disagreed with *Hutner*. *People v. Diefenbach*, No. 176489, slip op at 6 n.1 (Mich. App. August 20, 1996). Further, *Holt* was superseded by Wisconsin's sexual assault statute (Wis. Stat. §940.225(7) (2005)), which provides, "This section applies regardless of whether a victim is dead or alive at the time of sexual contact or sexual intercourse." Similarly, Pennsylvania's "involuntary deviate sexual intercourse" statute now provides that the term "forcible compulsion" includes "compulsion resulting in another person's death, whether the death occurred before, during or after the sexual intercourse." Pa. Cons. Stat. Ann. §3123(e) (2009 Supp.).

In *People v. Kelly*, 1 Cal. 4th 495, 822 P.2d 385, 3 Cal. Rptr. 2d 677 (1992), the trial

court instructed the jury, " 'It is legally possible to rape a dead body.  Where a defendant attempts to coerce his victim into intercourse with him, fails to accomplish [this] purpose while she is alive and kills her to satisfy his desires with her corpse, the killing falls within the felony murder rule.' "  (Emphasis omitted.)  *Kelly*, 1 Cal. 4th at 524, 822 P.2d at 399, 3 Cal. Rptr. 2d at 691. The California Supreme Court concluded that the first sentence of the instruction was erroneous because rape requires a live victim.  *Kelly*, 1 Cal. 4th at 524, 822 P.2d at 399, 3 Cal. Rptr. 2d at 691.  "This does not, however, mean that intercourse after death negates the felony-murder rule," since felony murder includes a killing committed in the perpetration of, or attempt to perpetrate, rape.  *Kelly*, 1 Cal. 4th at 524, 822 P.2d at 399, 3 Cal. Rptr. 2d at 691.  The *Kelly* court held, " 'Where a defendant attempts to coerce his victim into intercourse with him, fails to accomplish his purpose while she is alive, and kills her to satisfy his desires with her corpse, the killing is first degree murder.' "  *Kelly*, 1 Cal. 4th at 525, 822 P.2d at 400, 3 Cal. Rptr. 2d at 692, quoting *People v. Goodridge*, 70 Cal. 2d 824, 838, 452 P.2d 637, 645, 76 Cal. Rptr. 421, 429 (1969). Accordingly, the second sentence of the instructions correctly informed the jury of the law. *Kelly*, 1 Cal. 4th at 526, 822 P.2d at 400-01, 3 Cal. Rptr. 2d at 692-93.

Illinois law is dispositive of this issue.  In *People v. Thomas*, 137 Ill. 2d 500 (1990), the defendant argued that it was not possible for the murder to occur "in the course of" arson because the victim was dead at the time he started the fire.  Our supreme court found that the murder and arson occurred "essentially simultaneously." *Thomas*, 137 Ill. 2d at 534.  "It is not imperative that the State prove beyond a reasonable doubt that defendant formed the criminal intent to commit arson or aggravated arson before committing murder." *Thomas*, 137 Ill. 2d at 534.  It

was sufficient that the State proved the elements of the crimes and the accompanying felonies were part of the "same criminal episode." *Thomas*, 137 Ill. 2d at 534.

*Thomas* declined to adopt the California Supreme Court's reasoning in *People v. Morris*, 46 Cal. 3d 1, 756 P.2d 843, 249 Cal. Rptr. 119 (1988), and *People v. Green*, 27 Cal. 3d 1, 609 P.2d 468, 164 Cal. Rptr. 1 (1980), which determined that its capital punishment statute is inapplicable when the felony that accompanies the murder is " 'merely incidental to the murder.' " *Thomas*, 137 Ill. 2d at 534, quoting *Green*, 27 Cal. 3d at 61, 609 P.2d at 505, 164 Cal. Rptr. at 38. *Thomas* found that the language of the California statute is different from Illinois's statutes because it permits the imposition of the death penalty when the jury concluded that the defendant committed murder " 'during the commission or attempted commission of' " several enumerated felonies. *Thomas*, 137 Ill. 2d at 534, quoting *Green*, 27 Cal. 3d at 59, 609 P.2d at 504, 164 Cal. Rptr. at 37. This language contemplates a shorter time frame than does the " 'in the course of' " language found in the Illinois statute. *Thomas*, 137 Ill. 2d at 535, quoting Ill. Rev. Stat. 1985, ch. 38, par. 9-1(b)(6). "That is, we think that the Illinois statute recognizes that the crime of murder is not necessarily complete when the victim's heart stops beating, but rather the crime continues through the time that the perpetrator conceals the crime and flees the scene." *Thomas*, 137 Ill. 2d at 535. "The statute imparts no significance to the precise timing of the *** various felonies defendant commits." *Thomas*, 137 Ill. 2d at 535. Accordingly, the court concluded that a defendant is eligible for the death penalty if he commits murder and one of the specifically enumerated felonies either simultaneously or as part of the same criminal episode. *Thomas*, 137 Ill. 2d at 535.

Other Illinois cases have ruled similarly to *Thomas*. For example, in *People v. Richardson*, 123 Ill. 2d 322 (1988), our supreme court addressed the applicability of the death penalty if the murder was committed "in the course of" an armed robbery. *Richardson*, 123 Ill. 2d at 359, citing Ill. Rev. Stat. 1981, ch. 38, par. 9-1(b)(6)©). The defendant announced a robbery as he fired the first shot, then rifled through the cash register before he left the store. The court rejected the defendant's argument that the shooting was not committed "in the course" of the armed robbery because the shooting took place before the robbery began. The court held that "[j]ust as the phrase 'in the course of' does not require that defendant complete one of the other felonies in order to be eligible for the death sentence [citation], we also believe that it does not require that the armed robbery commence prior to the fatal gunshot." *Richardson*, 123 Ill. 2d at 359. The court continued, "[T]he precise timing of the offenses is not necessarily indicative of defendant's intent. The jury concluded beyond a reasonable doubt that defendant committed both a murder and an armed robbery, which offenses occurred essentially simultaneously." *Richardson*, 123 Ill. 2d at 359. See also *People v. Armstrong*, 183 Ill. 2d 130 (1998); *People v. Hampton*, 149 Ill. 2d 71 (1992); *People v. Flores*, 128 Ill. 2d 66 (1989); *People v. Ramirez*, 98 Ill. 2d 439 (1983) (all involving felony murder based on armed robbery). Our courts have applied the same reasoning to home invasion (*People v. Sample*, 326 Ill. App. 3d 914 (2001)), murder "in the course of" burglary (*People v. Pitsonbarger*, 142 Ill. 2d 353 (1990)), and murder "in the course of" aggravated kidnapping (*People v. Nitz*, 143 Ill. 2d 82 (1991)).

Here, defendant committed both murder and aggravated criminal sexual assault, and these crimes occurred "essentially simultaneously." It was sufficient that the State proved the elements

-24-

of the crimes were part of the "same criminal episode." *Thomas*, 137 Ill. 2d at 534. "To parse the crimes out into bounded acts would contradict the reality that these crimes were intertwined both temporally and functionally." *Sample*, 326 Ill. App. 3d at 928.

These cases, as well as *Hendrix*, are consistent with the majority of jurisdictions, which have adopted the "ongoing criminal assault rule." For example, in *McLaughlin*, the defendant argued that he was not guilty of rape because he raped the victim after he stabbed her. Noting that Missouri's rape statute did not expressly address whether the victim must be alive at the time of penetration, the court, like "the majority of jurisdictions to address this issue," adopted the "ongoing criminal assault" rule. *McLaughlin*, 265 S.W.3d at 268. "Under that rule, where the forcible compulsion that leads to the rape begins before the death of the victim, the defendant is guilty of rape even if the jury believes defendant killed the victim before penetration or before the sexual assault was concluded." *McLaughlin*, 265 S.W.3d at 268. The court noted important policy reasons why the death of the victim during the assault should not preclude a conviction for rape:

" 'We are likewise unable to embrace the notion that the fortuitous circumstance, for the rapist, that death may have preceded penetration by an instant, negates commission of the crime of aggravated rape and reduces it to a relatively minor offense associated with erotic attraction to dead bodies. *Reading the "live only" requirement into the statute encourages rapists to kill their victims*, in our opinion.' " (Emphasis in original.) *McLaughlin*, 265 S.W.3d at 268-69, quoting *State v. Brobeck*, 751 S.W.2d 828, 832 (Tenn. 1988).

1-07-2516

Accordingly, the court concluded:

"It is rape where defendant both kills and sexually assaults a victim in a single, continuous act, or in a series or closely related acts, and where, as part of the course of conduct, defendant uses forcible compulsion against the victim, even if portions of the rape, including penetration, occur once the victim has already been killed." *McLaughlin*, 265 S.W.3d at 269.

See also *State v. Honie*, 2002 UT 4, ¶49, 57 P.3d 977; *Commonwealth v. Waters*, 420 Mass. 276, 279-80, 649 N.E.2d 724, 726 (1995); *State v. Gallegos*, 178 Ariz. 1, 9, 870 P.2d 1097, 1105 (1994); *Brobeck*, 751 S.W.2d at 832; *Lipham v. State*, 257 Ga. 808, 809-10, 364 S.E.2d 840, 842 (1988); *Smith v. Commonwealth*, 722 S.W.2d 892, 894 (Ky. 1987); *State v. Usry*, 205 Conn. 298, 317-18, 533 A.2d 212, 222 (1987); *Lewis v. State*, 889 So. 2d 623, 683 (Ala. Crim. App. 2003); *State v. Jones*, 308 N.J. Super. 174, 189, 705 A.2d 805, 813 (1998); *State v. Collins*, 66 Ohio App. 3d 438, 443, 585 N.E.2d 532, 536 (1990).

*McLaughlin* and *Lipham* analogized to when an armed robber first kills his victim and then takes her money. "Even though the victim is dead when the robbery is consummated, and thereafter can no longer be 'forced' to do anything, it is still armed robbery because the theft continues and is able to be accomplished due to the deadly earlier force." *McLaughlin*, 265 S.W.3d at 269; *Lipham*, 257 Ga. at 809-10, 364 S.E.2d at 842.

In addition, committing a rape and a murder in a single, continuous act or in a series or closely related acts is unlike happening upon a corpse and engaging in sex with it. *Collins*, 66 Ohio App. 3d at 443, 585 N.E.2d at 536; *Lipham*, 257 Ga. at 810, 364 S.E.2d at 842-43. Even

assuming that defendant killed Mary first and then raped her, it is illogical to assume that he killed her, waited around for a while as she bled profusely on his apartment floor, and then raped her.

Illinois has been following the majority of jurisdictions to address the ongoing criminal assault rule, as exemplified by Illinois cases involving other crimes. Pursuant to *Hendrix* and the *Richardson* line of cases, we hold that the State was not required to prove beyond a reasonable doubt that Mary was alive at the time defendant sexually assaulted her since the murder and sexual assault occurred "essentially simultaneously."

2. *Sufficiency of the Evidence*

Even assuming that the State was required to prove that Mary was alive at the time of the sexual assault, we would find that it proved beyond a reasonable doubt that she was alive at the time of the assault. A person commits criminal sexual assault if he "commits an act of sexual penetration by the use of force or threat of force." 720 ILCS 5/12-13(a)(1) (West 2006). "Sexual penetration" is defined as follows:

"any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person *** into the sex organ or anus of another person, including but not limited to *** anal penetration. Evidence of emission of semen is not required to prove sexual penetration." 720 ILCS 5/12-12(f) (West 2006).

Further, a person commits aggravated criminal sexual assault if he commits criminal sexual

assault and: uses a dangerous weapon, causes bodily harm to the victim, acts in such a manner as to threaten or endanger the life of the victim, or perpetrates the sexual assault during the course of the commission of any other felony. 720 ILCS 5/12-14(a)(1) through (4) (West 2006).

When a court considers a challenge to a criminal conviction based on the sufficiency of the evidence, its function is not to retry the defendant. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Rather, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). Under this standard, a reviewing court must draw all reasonable inferences from the record in favor of the prosecution. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). A court of review will not overturn the fact finder's verdict unless "the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt." *People v. Maggette*, 195 Ill. 2d 336, 353 (2001).

Defendant's semen was present in Stachowicz's underwear, and he could not be excluded as a contributor to the male profile from the rectal swab. The vaginal swab showed the presence of sperm, and while there was a mistake with that sample, Mary's husband testified that they last had sex a week before her death. In addition, the side zipper on her pants was not zipped, which suggested that she did not dress herself. The evidence also showed that defendant used force during the sexual assault. See 720 ILCS 5/12-13(a)(1) (West 2006). Mary was stabbed 11 times in her head and neck. She was strangled, 10 of her ribs were fractured, and there were abrasions on her arms and elbows. The medical examiner testified that her rib fractures and the bruise to her groin were consistent with a sexual assault.

1-07-2516

Defendant nevertheless claims that his conviction should be reversed because there was no proof that Mary was alive when he raped her. Defendant contends that Mary must have been dead when he raped her because there was no evidence of vaginal or rectal tearing or bruising, her clothing was not torn, and he confessed to the murder but not to a sexual assault. While there was no evidence of injuries to Mary's vagina or rectum, the medical examiner testified that sexual assault can occur without any injuries to the body. Further, Mary gave birth four times, and each time a woman gives birth, the elasticity of the vagina is reduced, which, in turn, makes vaginal injuries less likely. See *People v. Shum*, 117 Ill. 2d 317, 356 (1987) (medical evidence is not required to prove rape).

More important, there would have been no need for defendant to compress Mary's torso and break 10 of her ribs had she not been alive and struggling. In *People v. Fisher*, 169 Ill. App. 3d 915 (1988), blood was found on the victim's pubic hair, and her bra was damaged, as if it had been forcibly removed. There was no evidence of injury to her breasts or genitalia, but there was blood on the defendant's underwear. The defendant was convicted of murder and attempted rape. On appeal, the defendant argued that his attempted rape conviction should be reversed because the victim was dead when he attempted to rape her. This court rejected the defendant's argument, finding that "if the victim was dead at the time of the attempted rape there would have been no need to engage in a violent struggle to disrobe and bind her." *Fisher*, 169 Ill. App. 3d at 922. As in *Fisher*, if Mary was dead when defendant sexually assaulted her, he would not have needed to compress her torso and break 10 of her ribs.

3. *Jury Instruction*

1-07-2516

Defendant next argues that, assuming the evidence was sufficient to show Mary was alive at the time of the sexual assault, the trial court erred in refusing defense counsel's instruction on this point. Defendant sought to have the jury instructed as follows: "When considering the charges involving sexual acts, you may not convict the defendant of Aggravated Criminal Sexual Assault or any murder charges referencing Aggravated Criminal Sexual Assault if you believe from the evidence that the sexual acts occurred after the death of Mary Stachowicz."

The purpose of a jury instruction is to " ' "convey to the minds of the jury the correct principles of law applicable to the evidence submitted to it." ' " *People v. Harris*, 225 Ill. 2d 1, 43 (2007), quoting *People v. Salazar*, 126 Ill. 2d 424, 464 (1988), quoting *People v. Gambony*, 402 Ill. 72 (1948). Further, Supreme Court Rule 451(a) (210 Ill. 2d R. 451(a)) provides that whenever the pattern jury instructions contain an instruction applicable in a criminal case and the court determines that the jury should be instructed on the subject, the pattern instruction shall be used, unless the court determines that it does not accurately state the law. 210 Ill. 2d R. 451(a); *Harris*, 225 Ill. 2d at 43. An appellate court applies an abuse-of-discretion standard when reviewing a trial court's decisions relating to instructions. *People v. Roberts*, 351 Ill. App. 3d 684, 690 (2004).

There is no dispute that the jury was properly instructed as to aggravated criminal sexual assault. The court gave the jury Illinois Pattern Jury Instructions, Criminal, Nos. 7.01, 7.02, 11.57, 11.58, 11.65, 11.65C, 11.65E, and 11.65F (4th ed. 2000), which adequately informed the jury of the definitions and elements of felony murder and aggravated criminal sexual assault.

-30-

Therefore, under Supreme Court Rule 451(a), the instructions were sufficient. While defendant contends that these instructions do not specify whether sexual acts committed on a deceased person qualify as criminal sexual assault, we found above that the State was not required to prove that Mary was alive at the time of the sexual assault.

## B. Burglary

### 1. *Sufficiency of the Evidence*

A person commits burglary "when without authority he knowingly enters or without authority remains within a building ***, or any part thereof, with intent to commit therein a felony or theft." 720 ILCS 5/19-1(a) (West 2006). Defendant contends that because the evidence showed that he had unlimited authority to be in the funeral home, the State failed to prove a lack of authority, as the statute requires. Defendant cites the testimony of Francine Sikorski that on November 13, 2002, defendant still had the keys to the funeral home and had the authority to be anywhere within the funeral home. Therefore, defendant argues, he had unlimited authority to be inside the funeral home. See *People v. Reid*, 179 Ill. 2d 297, 316-17 (1997); *People v. Taylor*, 318 Ill. App. 3d 464, 473 (2000) (reversing home invasion conviction where defendant was an overnight guest at the apartment); *People v. Moulton*, 282 Ill. App. 3d 102 (1996) (reversing conviction for home invasion where defendant was joint tenant of the dwelling).

We note, however, that Sikorski's testimony was impeached by her admission that she "might" have told the police the night of the murder that she had fired defendant and Scacchitti, and other evidence was presented showing that she had fired the two men. Scacchitti also

testified that he and defendant had been fired and no longer entered the funeral home. We find that this conflicting testimony on the issue of authority was one for the jury to decide.

Furthermore, Sikorski's testimony is insufficient to allow defendant to escape the parameters of the limited authority doctrine. The limited authority doctrine "states that authority to enter a building for a specific lawful purpose is vitiated when the wrongdoer departs from that purpose and commits a felony or theft." *People v. Wilson*, 155 Ill. 2d 374, 376 (1993). This is because if the entrant's intent to commit criminal acts therein had been "communicated to the owner at the time of entry, it would have resulted in the individual's being barred from the premises *ab initio*." *People v. Bush*, 157 Ill. 2d 248, 253-54 (1993).

In *People v. Woolsey*, 24 Ill. App. 3d 1079 (1975), the defendant, using a key given to him by his employer, entered his place of employment after working hours and took materials therefrom. The court affirmed the defendant's conviction for burglary and rejected his argument that he had authority to enter the building: " 'While unlimited consent to enter is always a defense against a charge of burglary ***, a consent limited as to place, time, or purpose is not a defense where entry occurs outside the limitations stated or implied.' " *Woolsey*, 24 Ill. App. 3d at 1082, quoting *Annot.*, 93 A.L.R.2d 531, 537 (1964). The evidence supported the conclusion that the defendant's authority to enter the building was limited to those occasions necessary to further the employer's activities. *Woolsey*, 24 Ill. App. 3d at 1082-83. Similarly, here, Sikorski's testimony could not support an acquittal on the basis that defendant had authority to enter or remain in the funeral home because any consent that may have been given was vitiated by defendant's series of criminal activities. The fact that defendant once worked at the funeral

home and sometimes used the door to the public business did not provide a blanket consent because whatever consent that remained was insufficient to excuse his unauthorized entry or remaining for the purposes of committing a theft.

Defendant, citing *People v. Meeker*, 86 Ill. App. 3d 162 (1980), and *People v. Baker*, 59 Ill. App. 3d 100 (1978), contends that the limited authority doctrine does not apply to this case. However, *Baker* and *Meeker* are distinguishable on the basis that no evidence was presented to show the defendants' unauthorized entry in those cases. Here, on the other hand, the State presented evidence that defendant no longer worked at the funeral home, that the funeral home was not open to the public, and that the funeral home remained locked at all times except during visitations. In addition, defendant lived in an apartment above the funeral home, with a separate access door, not within the funeral home. Further, Scacchitti testified that he and defendant had been fired and no longer entered the funeral home.

### 2. *Jury Instruction*

Defendant argues that if this court finds the evidence sufficient to support his burglary conviction, it should still remand for retrial on that charge because an erroneous burglary instruction was given to the jury. Defendant was charged with one count of burglary based on an unlawful entry into the funeral home and predicated on an intent to commit theft. However, the jury was instructed that defendant was guilty of burglary if he "without authority remain[ed] within" the funeral home "with intent to commit therein the offense of theft or concealment of a homicidal death." Defendant contends that this instruction constructively amended the indictment because it changed the method of committing the burglary and broadened the

-33-

possible mental states. He maintains that his fifth amendment rights have been violated, since "a person's right to notice of a charge and an opportunity to mount a defense in court is basic to our system of jurisprudence."

The State contends that defendant waived this argument. At trial, defendant objected to the State's burglary instruction only on the basis of the limited authority doctrine, not because it broadened the indictment. See *People v. Eyler*, 133 Ill. 2d 173, 219 (1989) (specific objections waive all grounds not specified). Further, he did not raise this specific issue in his posttrial motion. To preserve a question for appellate review, both a trial objection and a written posttrial motion raising the issue are required. *People v. Pinkney*, 322 Ill. App. 3d 707, 715 (2000).

The doctrine of plain error serves as a " 'narrow and limited exception' " to the general rule of procedural default. *People v. Szabo*, 113 Ill. 2d 83, 94 (1986), quoting *People v. Pastorino*, 91 Ill. 2d 178, 188 (1982); 134 Ill. 2d R. 615(a). The plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to review an unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Under the first prong, "the defendant must prove 'prejudicial error.' That is, the defendant must show *** that the evidence is so closely balanced that the error alone threatened to tip the scales of justice against him." *Herron*, 215 Ill. 2d at 187. Under the second prong, "the defendant must prove that there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process."

*Herron*, 215 Ill. 2d at 187. "In both instances, the burden of persuasion remains with the defendant." *Herron*, 215 Ill. 2d at 187. Defendant contends that both prongs of the plain-error rule apply because the evidence of burglary was closely balanced and he was convicted based on a theory of burglary that was never presented to the grand jury.

We agree with the State that the evidence of burglary, discussed above, was overwhelming. Defendant had been fired from the funeral home, he and Ray had a fight that morning about defendant's life path, defendant admitted that he planned to take money and anything valuable from Ray and the funeral home to buy a ticket to Las Vegas, and he entered the funeral home and took money from Mary's purse.

As for the second prong of the plain-error rule, both the United States and Illinois constitutions provide a criminal defendant with the fundamental right to be informed of the nature and cause of the charges against him. *People v. Likar*, 329 Ill. App. 3d 654, 660 (2002), citing U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8. "When the sufficiency of a charging instrument is challenged for the first time on appeal, this court is called upon to determine whether the charging instrument apprised the defendant of the precise offense charged with enough specificity to allow preparation of his defense and to allow pleading of the judgment as a bar to future prosecution arising out of the same conduct." *Likar*, 329 Ill. App. 3d at 660. In the instant case, the indictment sufficiently apprised defendant of the offense charged with enough specificity to allow preparation of his defense and to plead the judgment as a bar to future prosecution for the same conduct.

C. *Batson*

-35-

1-07-2516

Defendant next argues that the trial court erred in determining that he failed to show a *prima facie* case of discrimination under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), in the State's use of peremptory challenges to exclude four African American venirepersons.

Jury selection took place over two days; the parties each had 14 peremptory challenges, and on each day, 28 prospective jurors were questioned. On the first day, the State exercised peremptory challenges against three venirepersons: Susan Farese, who was Caucasian, and Juan Munoz and Judith McCain Brown, whose races are not known. On the second day, the State exercised peremptory challenges against three African American venirepersons: Patricia Wilkerson, Robert Joyner, and Richard Monroe. After the jury was seated, the State exercised a peremptory challenge against a potential venireperson for one of the four alternate positions, Clifford Haywood, an African American.

Defense counsel made a *Batson* challenge. The assistant State's Attorney argued that defendant failed to make a *prima facie* case of discrimination because defendant is Hispanic and Caucasian, there were no African American attorneys or witnesses in the case, and the defense had used its six previous peremptory challenges against Caucasians. The court noted that "by my count there are four African Americans, one Hispanic, and I believe there are two of Asian descent." The court denied the *Batson* motion, concluding, "I think *** you're looking at what we are doing today, not the entire jury selection process." In its response to defendant's motion for new trial, the State represented that the final jury consisted of six Caucasians, four African Americans, one Hispanic, and one Asian American.

1-07-2516

In *Batson*, the United States Supreme Court "held that in a criminal case the fourteenth amendment's equal protection clause prohibits the State from using a peremptory challenge to exclude a prospective juror based solely on the basis of his or her race." *People v. Macias*, 371 Ill. App. 3d 632, 645 (2007). The *Batson* Court established a three-step process for evaluating claims of discrimination in jury selection. The defendant must first make a *prima facie* case showing that the State exercised its peremptory challenges on the basis of race. *People v. Easley*, 192 Ill. 2d 307, 323 (2000). If the defendant makes a *prima facie* showing, the burden shifts to the State to articulate a race-neutral reason for excusing the venireperson. *Easley*, 192 Ill. 2d at 323-24. When the State has articulated its reasons for excusing the venirepersons, the trial court determines whether the defendant has satisfied his burden of establishing purposeful discrimination. *Easley*, 192 Ill. 2d at 324.

"It is settled that a *Batson prima facie* case cannot be established merely by the numbers of black venirepersons stricken by the State." *People v. Peeples*, 155 Ill. 2d 422, 469 (1993). Rather, the issue is whether, in consideration of "all relevant circumstances," a *prima facie* case of discrimination has been established. *People v. Coulter*, 230 Ill. App. 3d 209, 222 (1992). "Relevant circumstances" include, but are not limited to, the following: (1) racial identity between the defendant and the excluded venirepersons, (2) a pattern of strikes against African American venire members, (3) disproportionate use of strikes against such members, (4) the level of African American representation in the venire as compared to the jury, (5) prosecutorial questions and statements during *voir dire* and while exercising challenges, (6) whether the excluded venirepersons were a heterogeneous group sharing race as their only common

-37-

characteristic, and (7) the races of the defendant, victim, and witnesses. *People v. Williams*, 173 Ill. 2d 48, 71 (1996). The trial court's determination as to whether a *prima facie* case of discrimination has been shown will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Williams*, 173 Ill. 2d at 71.

The first relevant circumstance is whether defendant and the excluded venirepersons share the same race. Here, there is no racial identity between defendant and the stricken jurors. Defendant is Caucasian and Hispanic, while the excluded jurors are African American. Although this factor is relevant, it is not dispositive in determining whether a *prima facie* case exists. *Williams*, 173 Ill. 2d at 72.

The next relevant circumstance is whether the State used a disproportionate number of peremptory challenges to exclude African Americans. Four of the seven panel members struck by the State were African American. In *People v. Hughes*, 257 Ill. App. 3d 633 (1993), and *People v. Nicholson*, 218 Ill. App. 3d 273, 283 (1991), the use of five out of seven strikes against African Americans constituted a pattern of strikes. Defendant also cites cases where the State's use of five of six peremptory challenges against African Americans constituted a pattern of strikes. These cases are distinguishable, however, where the State in those cases used all but one of its strikes on African Americans versus just over half here. See *People v. Nicholson*, 218 Ill. App. 3d 273, 283 (1991); *People v. Lockhart*, 201 Ill. App. 3d 700, 710 (1990).

Next, it must be determined whether there was a pattern of strikes against African American venire members. This inquiry is different from the question of whether the State used a disproportionate number of peremptory challenges to exclude African Americans. While the

proportionality analysis compares the number of peremptories used against African Americans versus the number used against Caucasians, the pattern analysis compares the number of African Americans that could have been, but were not, struck by the State. *People v. Lann*, 261 Ill. App. 3d 456, 463 (1994). Before exercising peremptory challenges against Wilkerson, Joyner, Monroe, and Haywood, the State had accepted two panels that included four African Americans. Our supreme court has previously found that when a *Batson* claim is made regarding discrimination against a particular race, the unchallenged presence of jurors of that race on the seated jury tends to weaken the basis for a *prima facie* case of discrimination. *People v. Rivera*, 221 Ill. 2d 481, 513 (2006).

The fourth factor is the level of African American representation in the venire as compared to the jury. We first note a discrepancy in the record as to the racial makeup of the final jury. The trial court stated that the final jury consisted of four African Americans, one Hispanic, and two Asians. In its response to defendant's motion for new trial, the State claimed that the jury consisted of six Caucasians, four African Americans, one Hispanic, and one Asian American; on appeal, the parties continue to cite these numbers. Even applying the proportions cited by the parties on appeal, however, we still find that the empaneled jury had higher percentage of African Americans than the venire.

Excluding those venirepersons excused for cause (*People v. Evans*, 125 Ill. 2d 50, 65 (1988)), the venire contained 39 prospective jurors. Of those 39, 21 were Caucasian (53.8 %); 11 were African American (28.2 %); 6 were Hispanic (15.4 %); and 1 was Asian American (2.6 %). According to the parties, the final 12-person jury consisted of 6 Caucasians (50 %); 4

1-07-2516

African Americans (33.3 %); 1 Hispanic (8.3 %); and 1 Asian American (8.3 %). Thus, a larger percentage of African Americans served on the jury than were present in the venire. See *Evans*, 125 Ill. 2d at 65 (empaneled jury had higher percentage of African Americans than the venire).

This court must also analyze questions and statements made during he prosecutor during *voir dire* and while exercising challenges. Defendant does not allege, and the record does not indicate, that the assistant State's Attorneys' statements or questions to the jury were racially motivated.

Another factor that has been taken into consideration in determining whether a defendant has presented a *prima facie* case is the race of the defendant, the victim, and the witnesses. *Williams*, 173 Ill. 2d at 71. The victim was Caucasian, and defendant is Caucasian and Hispanic. The attorneys were Caucasian, and the witnesses were Caucasian, African American, Hispanic, and Asian. There were no racial overtones in the case. See *Evans*, 125 Ill. 2d at 65-66 (any racial issue inherent in the selection of the jury was minimal where the case did not involve "an interracial crime in which specific racial groups would be prone to take sides of prejudice").

The final relevant circumstance is whether the excluded venirepersons were a heterogeneous group sharing race as their only common characteristic. Defendant claims that the four stricken jurors shared race as their only common characteristic, as one was widowed, one was married, one was single, and one had a domestic partner; two had been victims of property offenses, while two had not been victims of any crimes; and "they each had different kids of jobs and interests." Defendant also compares the four stricken jurors' qualifications to

-40-

those of the seated jurors; he claims that Joyner was similar to Anthony Magnifico, a seated juror, because both were married with children, worked as skilled laborers, and had been a victim or married to a victim of a property offense for which no one was arrested. He compares Joyner and Monroe, who had food-service experience, to seated juror Loretta Jackson, who was studying to be a chef. However, three of the four stricken jurors had children, none had been convicted of a crimes, and both Joyner and Haywood were in security-type jobs without formal law enforcement training.

While defendant makes much of the fact that the State used its final four challenges against African Americans, he cites no case law holding that this pattern suggests discrimination. In addition, it is well established that the court must consider "the totality of the relevant facts" and "all relevant circumstances" surrounding the strikes. *People v. Davis*, 231 Ill. 2d 349, 360 (2008). Thus, it was proper for the trial court to consider the entire jury selection process, not only, as the trial court noted, "what we are doing today." Further, the State argued in response to defendant's *Batson* challenge at trial that defendant used 13 of his 16 peremptory challenges to strike Caucasians, and after the eleventh juror was accepted, defendant struck 10 Caucasians.

Defendant also argues that the trial court used the incorrect standard in ruling on his *Batson* motion. He contends that the trial court made a conclusory determination that no discrimination had occurred without first considering whether he had presented a *prima facie* case of discrimination. He cites *People v. Hogan*, 389 Ill. App. 3d 91 (2009), which concluded that the trial court did not follow the three-step procedure delineated by *Batson* as to the

-41-

defendant's first *Batson* motion where it failed to ask the defendant to make a *prima facie* showing before making a judicial determination. *Hogan*, 389 Ill. App. 3d at 101. Unlike the defendant in *Hogan*, defendant in the instant case first argued that a *prima facie* case of discrimination was established because he was a minority, the last four peremptory challenges used by the State were against minorities, and there was nothing in their backgrounds that distinguished them from the seated jurors. The State responded that a *prima facie* case had not been established because defendant was not a minority, the State did not engage in a pattern of strikes against African Americans, and the last six jurors struck by defendant were Caucasian. The trial court analyzed the "entire jury selection process" and denied the motion. Therefore, the trial court did not collapse the three-step *Batson* procedure.

### D. State's Closing

Next, defendant argues that he was denied a fair and impartial trial by the State's closing arguments, which argued facts not in evidence, urged the jury to reach a verdict out of outrage, and disparaged defendant and his counsel. He contends that the cumulative effect of the prosecutor's improper comments requires reversal of his convictions.

"[D]efendant faces a substantial burden in attempting to achieve reversal [of his conviction] based upon improper remarks made during closing argument." *People v. Williams*, 332 Ill. App. 3d 254, 266 (2002). Prosecutors enjoy wide latitude in closing arguments. *People v. Caffey*, 205 Ill. 2d 52, 131 (2001). In reviewing comments made at closing arguments, this court asks whether they "engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *People v. Wheeler*, 226

1-07-2516

Ill. 2d 92, 123 (2007). A reviewing court will not reverse a jury's verdict based on improper remarks made during closing arguments unless the comments resulted in substantial prejudice to the defendant and constituted a material factor in his conviction. *People v. Brooks*, 345 Ill. App. 3d 945, 951 (2004).

Defendant contends that the State engaged in speculation and misstated evidence when it argued: (1) that Mary was washing dishes when she caught defendant going through her purse, (2) that she threatened to call the police; (3) that he grabbed her and dragged her upstairs, and (4) that Sikorski removed any evidence of a struggle by cleaning the funeral home. "To be proper, closing argument comments on evidence must be either proved by direct evidence or be a fair and reasonable inference from the facts and circumstances proven." *People v. Hood*, 229 Ill. App. 3d 202, 218 (1992).

The argument that defendant was caught going through Mary's purse was supported by several facts, including that money was missing from her purse, that defendant admitted taking money from her purse, and that her purse was in an area where cash was hidden inside the funeral home. The evidence also supported the argument that Mary was washing dishes when something interrupted her, as Sikorski testified that there was a clean dish and a dish towel on the table near Mary's jacket and purse.

The State further responds that the argument that defendant grabbed Mary and dragged her upstairs after she threatened to call the police was based on defendant's fictional account of two Hispanic men trying to burglarize his apartment, portions of which were truthful if "defendant's name [is] inserted into that story." For example, defendant told Detective

-43-

McDonald that he believed the two men climbed up the garage and entered his apartment through the rear window. Defendant stated that Mary probably heard them as they moved the safe and threatened to call the police. The offenders, according to defendant's fictional account, probably left the apartment, grabbed Mary, and dragged her back to the apartment, where they beat her to death when she violently fought back. Defendant also eventually admitted to Detective Rutherford that he grabbed Mary by her hair and dragged her into the apartment. Similarly, the prosecutor's "desperate inference" that there were scuff marks based on a photograph of the staircase leading to defendant's apartment was supported by defendant's story that the two Hispanic men dragged Mary up the stairs; the photo showing black marks on the staircase; and defendant's admission that he "dragged" Mary into his apartment.

As for defendant's contention that the prosecutor speculated as to why Mary had to have been brought upstairs to be killed, we note that, in his "fictional" account, defendant stated that the Hispanic men brought Mary upstairs to avoid getting blood on the funeral-home carpet. In addition, the front doors are made of glass and face a busy road and a church; the crime was committed in broad daylight; and a funeral, for which clothes were being dropped off, was scheduled for the next day. Furthermore, the argument in rebuttal that Sikorski removed evidence of a struggle in the funeral home could be construed as a response to defendant's closing argument that "there wasn't one speck of evidence to even suggest that a struggle took place anywhere on the first floor of that funeral home." The State noted that the funeral home was going to be used for a wake the next day, and "Don't you think Francine is going to clean that funeral home?" In his confession, defendant said he used three rolls of paper towels to

clean up the victim's blood, put three plastic bags over her head, and wrapped her body in a sheet to staunch the flow of her blood.

Finally, defendant contends that the State ignored uncontested evidence when it argued that the struggle occurred in the kitchen. However, defendant himself admitted in one of his statements that part of the struggle occurred in the kitchen. Furthermore, Mary had injuries to her elbows consistent with friction with a hard surface, and it is reasonable to assume that if defendant had raped and stabbed Mary in the den, there would have been more blood on the furniture, boxes, and rug.

Defendant argues that the State ignored the "one account of events" that was in evidence--*i.e.*, defendant's videotaped statement--and created a scenario that was unsupported, or even contradicted by, the trial evidence. However, the jury was not required to believe the entirety of defendant's videotaped statement, especially when defendant previously lied to the police and the evidence contradicts his statement. See *People v. Washington*, 375 Ill. App. 3d 243, 259 (2007).

Defendant also argues that the State urged the jury to reach a verdict out of outrage when it repeatedly disparaged defendant and defense counsel. See *People v. Blue*, 189 Ill. 2d 99, 129-30 (2000); *People v. Hope*, 116 Ill. 2d 265, 278 (1986). For example, the prosecutor twice asked the jury to consider what was going through the minds of Mary's family members. First, he stated, "Can you imagine the worst fears for a loved one who has gone missing? The worst fears you can ever imagine. Take the worst fears of all the loved ones of Mary combined and you can't even begin to imagine the horror this man inflicted on her." The court sustained

defendant's objection. Seconds later, the prosecutor stated, "Think about what was going through the family members' minds while she was in those floor boards. Think about and contrast it to defendant's own actions." The trial court's sustaining defendant's objection to the first comment and instruction the jury to disregard the comment cured any prejudice. *People v. Martinson*, 89 Ill. App. 3d 66, 68 (1980). Further, defendant did not object to the second comment, nor did he include it in his posttrial motion. The second comment, which was brief, can also be considered a reasonable inference in support of defendant's consciousness of guilt, particularly about the concealment of a homicidal death.

The second brief reference was both shorter and less prejudicial than the arguments in *Blue* and *Hope*, the cases that defendant relies on. In *Blue*, the State argued that the victim's parents " 'need to hear from you that even though they suffered the worst nightmare a parent could suffer, that they had to bury their child, they need to hear from you that they will get justice.' " *Blue*, 189 Ill. 2d at 128. The State also argued that the victim's daughter " 'needs to hear *** that daddy didn't die in vain.' " *Blue*, 189 Ill. 2d at 128. In *Hope*, the State elicited testimony from the victim's wife that she had three children, age 10 or younger, and identified photos of the victim and his family. In closing, the State referred to the victim's family, stating, " 'Little did [the victim] know that when he said good-bye to his wife, that would be the last time he saw her alive ***.' " *Hope*, 116 Ill. 2d at 277.

Defendant also argues that the prosecutor improperly invited the jurors to put themselves in Mary's mind during the rape. This argument was relevant to rebut consent to the sexual assault, as well as Mary's submission to the assault, as illustrated by her mental state at the time

of the assault.

Defendant next argues that the prosecutor improperly called him a "monster" five times. After the first reference, the trial court overruled defendant's objection. The State proceeded, "Right here over here is the monster, folks. Not because I'm saying it, because he's saying it. And he's never been more right." Later, the prosecutor said, "You can take confidence in knowing it's this monster who deposited that DNA." The trial court sustained defendant's objection to calling him a monster this time, and the State went on to say, "He called himself a monster. That's the evidence." The State further argued, "When you look at this evidence, you come to one conclusion and that is he is evil." The State also accused defendant of "playing the blame game" by attempting to "blame mommy" after Mary's body was found: "Okay, I had a bad childhood. Great, I guess I can rape, rob, and kill now and blame mommy if I get caught."

"A closing argument must serve a purpose beyond inflaming the emotions of the jury." *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Therefore, a prosecutor may not "characterize the defendant as an 'evil' person or cast the jury's decision as a choice between 'good and evil.' " *Nicholas*, 218 Ill. 2d at 121. A prosecutor may, however, "comment unfavorably on the evil effects of the crime and urge the jury to administer the law without fear, when such argument is based on competent and pertinent evidence." *Nicholas*, 218 Ill. 2d at 121-22. In *Nicholas*, the court found no error when the prosecutor argued, " 'And when she screams, please, don't, he pulls the trigger, and pulls the trigger again, and pulls the trigger again, and pulls the trigger again, pure evil.' " *Nicholas*, 218 Ill. 2d at 113. "Pure evil" referred to the defendant's actions of getting his gun, hunting his mother in the street, shooting her four times, stashing the gun,

returning to bed, and displaying little concern about her death. *Nicholas*, 218 Ill. 2d at 113.

Here, the State claims that the words "monster" and "evil" accurately describe defendant's actions. Further, defendant injected the term "monster" into the proceedings by calling himself that in his note to Scacchitti and in his videotaped statement. Indeed, the prosecutor stated more than once in closing that it was defendant who called himself a monster. In addition, the comment about the "blame game" was directed at defendant's statement that he saw his mother's face immediately before he stabbed Mary, and it responds to a major theme in his case, *i.e.*, that he was less culpable because of the abuse he suffered as a child. The State clarified this position when it next stated, "Really? That's an insult to anybody who ever had a tough childhood."

Defendant also argues that the State mocked his defense and ridiculed defense counsel. The prosecutor commented regarding defense counsel's cross-examination of the State's DNA expert, "In this case you heard a lot of questions about DNA *ad nauseum*" and, "So for all future rapists out there make sure you kill your victim." The State responds that the first comment was an accurate description of the cross-examination because defense counsel spent a considerable amount of time questioning the forensic scientist regarding the statistical information linking defendant's DNA profile to the material recovered from Mary's body. It further contends that it was responding to the defense theory by conveying the strength of the scientific evidence that defendant was ignoring. Regarding the second comment, it was made in response to defendant's argument, which was the same as that before this court, that sexually assaulting a dead person does not constitute sexual assault. The assistant State's Attorney's argument expressed the same

concern as did the court in *McLaughlin*, 265 S.W.3d at 268-69, as previously discussed.  In any event, the trial court sustained defendant's objection.

Defendant also contends that the State "mocked the very idea to raising defenses to the non-murder charges."  For example, the prosecutor argued:

"If Nicholas Gutierrez or when Nicholas Gutierrez murdered Mary Stachowicz and stuck her in the floor boards, Mary Stachowicz still–the only one that could have stopped Nicholas Gutierrez from taking that purse was Mary Stachowicz.  How did he stop her from doing that?  By killing her and putting her in the floor boards.  That doesn't give you a free robbery to go down--a free crime to go down and take the property."

Defendant argues that characterized the defense mounted as a "request for a free crime."  See *People v. Kuntu*, 196 Ill. 2d 105, 145 (2001) (the trial court erred in allowing the State to argue that not sentencing the defendant to death would be like giving him five free murders).  The State contends that it was simply responding to defendant's theory and explaining that the application of force can occur before or after the taking of the property as long as it is part of a continuous course of conduct.  Further, the jury acquitted defendant of robbery and armed robbery, so it is unclear how this comment could have prejudiced him.

Finally, defendant claims that the State twice improperly referred to his defense as "splitting hairs."  The State responds that it was properly challenging the credibility of his theory as he attempted to parse out the force requirement of different offenses in an effort to eliminate his guilt on all offenses.  *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000).

1-07-2516

We find that the comments that the state made during closing arguments were not improper. Further, they did not result in substantial prejudice to the defendant, nor did they constitute a material factor in his conviction. See *Brooks*, 345 Ill. App. 3d at 951.

### E. Sentence

Defendant argues that the trial court, in sentencing him to life imprisonment for the murder, failed to give adequate weight to the mitigating factors of his age, lack of significant criminal history, abusive childhood, mental illnesses stemming from that abuse, and rehabilitative potential. Defendant requests that this court reduce his sentence pursuant to Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)).

The sentencing decisions of a trial court are entitled to great deference and weight because "a trial judge is in a far better position than an appellate court to fashion an appropriate sentence" based on firsthand consideration of the defendant's credibility, demeanor, moral character, and other relevant factors. *People v. Govea*, 299 Ill. App. 3d 76, 91 (1998), citing *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). Accordingly, a trial court has wide latitude in determining and weighing factors in mitigation or aggravation in imposing a sentence. *People v. Madura*, 257 Ill. App. 3d 735, 739 (1994). When the imposed sentence falls within the statutory guidelines, it will not be disturbed unless its imposition constitutes an abuse of discretion. *Madura*, 257 Ill. App. 3d at 739-40.

A reviewing court will not engage in the reweighing of sentencing factors. *People v. Cagle*, 277 Ill. App. 3d 29, 32 (1996). "We will presume the trial court considered all mitigating evidence before it, absent a contrary indication other than the sentence." *Cagle*, 277

Ill. App. 3d at 32. Additionally, mitigating factors do not automatically require the sentencing judge to give less than the maximum sentence. *Cagle*, 277 Ill. App. 3d at 32. Where the sentencing court examines the presentence report, it is presumed that the court took into account the defendant's potential for rehabilitation. *Madura*, 257 Ill. App. 3d at 739.

First, defendant argues that the trial court did not give sufficient weight to his age. At the time of the murder, he was 19 years old and was, according to defendant, "finally on the path to maturity and independence." He contends that a defendant's youth, standing alone, is an important mitigating factor. He cites *People v. Clark*, 374 Ill. App. 3d 50, 75 (2007) (reducing sentence for murder from 44 to 36 years particularly in light of the defendant's age, 18 at the time of the murder, and lack of significant criminal background), *People v. Brown*, 243 Ill. App. 3d 170, 176 (1993) (reducing sentence for murder from 45 to 30 years because the defendant was 20 at the time of the murder and lacked any prior criminal history), and *People v. Maldonado*, 240 Ill. App. 3d 470, 484 (1992). However, the supreme court has rejected the use of comparative sentencing from unrelated cases as a basis for claiming that a particular sentence is excessive or that the judge abused his discretion. *People v. Fern*, 189 Ill. 2d 48, 62 (1999). "We hold that a claim that a sentence is excessive must be based on the particular facts and circumstances of that case. If a sentence is appropriate given the particular facts of that case, it may not be attacked on the ground that a lesser sentence was imposed in a similar, but unrelated, case." *Fern*, 189 Ill. 2d at 62.

Next, defendant argues that his childhood was characterized by abuse and neglect, which further mitigated his sentence. While the State minimizes the evidence of abuse, claiming that

Carol Garza testified about five acts of "possible abuse or neglect," the evidence seems clear that he had a tumultuous, abusive childhood. The evidence also showed that after defendant was taken away from his mother, he spent time at nine difference facilities.

In the presentence investigation (PSI) report, defendant reported being sexually abused by a babysitter and his mother's boyfriends. A few times, his mother made him drink until he passed out, and when he was nine, his mother beat him until he passed out. He had to observe his mother having sex and saw two men murdered by his mother's boyfriend.

Defendant cites *People v. Margentina*, 261 Ill. App. 3d 247 (1994), in support of his argument. In *Margentina*, the Third District found that the trial court abused its discretion in sentencing the defendant to 50 years for murder where he was 18 years old at the time of the murder, was raised in a "terrible" environment, and was provoked. While defendant here had a tumultuous childhood and was only 19 at the time of the murder, it is doubtful that he was provoked. In his statements to the police, defendant claimed that Mary followed him up the stairs to his apartment and asked, "Why don't you like girls? Why do you fuck boys?" Mary's family, however, testified that they never heard Mary use such language. Even assuming that events unfolded as defendant claimed, his action of grabbing Mary and dragging her into the apartment was disproportionate to what she did. Therefore, *Margentina* is distinguishable.

Defendant also claims that he shows "promising rehabilitation potential" because the only tickets he received in jail arose from instances where an entire tier was ticketed; he was housed in the "Christian deck"; and at the time of the offense, he had helped out at the funeral home for two years and then found his own job at Subway. He also touts his lack of significant

criminal history. However, while he was not charged with and convicted of a plethora of violent crimes, his background shows violent tendencies.

Most important, the trial court specifically discussed the evidence that defendant presented in mitigation. The judge noted defendant's age at the time of the murder; his good behavior in jail; his early placements in DCFS, where "there was very little, if any, supervision of these young children"; the impeachment of Sharon E.; and the physical and sexual abuse he experienced as a child. The court found, however, that the most significant factor in aggravation was "the actual facts of the case." In determining a sentence, the trial court must balance the interests of society against the ability of a defendant to be rehabilitated. *People v. Tye*, 323 Ill. App. 3d 872, 890 (2001). However, a trial court is not required to give greater weight to the rehabilitative potential of a defendant than to the seriousness of the offense. *Govea*, 299 Ill. App. 3d at 91. In fact, the seriousness of the crime committed is considered the most important factor in fashioning an appropriate sentence. *Tye*, 323 Ill. App. 3d at 890. The trial court correctly noted the seriousness of the crime.

Because defendant's sentence is within the statutory requirements and the trial court considered all factors in sentencing defendant, we affirm his sentence of life imprisonment.

### F. Mittimus

In a supplemental brief, defendant argues that his mittimus should be corrected to reflect the three-year sentence for concealment of a homicidal death that was orally imposed by the court. The State concedes that the mittimus should be corrected. Accordingly, pursuant to Supreme Court Rule 615(b)(1) (134 Ill. 2d R. 615(b)(1)), we order the clerk of the circuit court

1-07-2516

to make the necessary correction.  See *People v. Jones*, 376 Ill. App. 3d 372, 395 (2007).

### III.  CONCLUSION

For the foregoing reasons, we affirm defendant's convictions and sentence.  We also order that defendant's mittimus be corrected to reflect a sentence of three years for concealment of a homicidal death.

Affirmed; mittimus corrected.

QUINN and COLEMAN, J.J., concur.

| | |
|---|---|
| Please Use Following Form: | REPORTER OF DECISIONS – ILLINOIS APPELLATE COURT<br>(Front Sheet to be Attached to Each Case) |
| Complete TITLE of Case | THE PEOPLE OF THE STATE OF ILLINOIS,<br><br>Plaintiff-Appellee,<br><br>v.<br><br>NICHOLAS GUTIERREZ,<br><br>Defendant-Appellant. |
| Docket No.<br><br>COURT<br><br>Opinion Filed | Nos. 1-07-2516<br>Appellate Court of Illinois<br>First District, THIRD Division<br><br>June 30, 2010<br>(modified upon rehearing)<br>(Give month, day and year) |
| JUSTICES | PRESIDING JUSTICE MURPHY delivered the opinion of the court:<br><br>Quinn and Coleman, JJ., concur [s] |
| APPEAL from the Circuit Ct. of Cook County, Criminal Div. | Lower Court and Trial Judge(s) in form indicated in the margin:<br><br>The Honorable William G. Lacy , Judge Presiding. |
| For APPELLANTS, John Doe, of Chicago.<br><br><br><br><br>For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel) | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.<br><br>Attorneys for **Petitioner-Appellant:** Michael J. Pelletier, State Appellate Defender<br>Patricia Unsinn, Deputy Defender<br>Christopher Kopacz, Asst. Appellate Defender<br>203 N. LaSalle Street, 24th Floor<br>Chicago, IL 60601<br>Phone: (312) 814-5472<br><br><br>Attorneys for **Respondent-Appellee**: Anita Alvarez, State's Attorney of Cook County<br>Of counsel: James E. Fitzgerald, Ashley A. Romito, Jessica R. Ball, Asst. State's Attorneys<br>309 Richard J. Daley Center<br>Chicago, IL 60602<br>Phone: (312) 603-3362 |